575 So.2d 683 (1991)
Linda WILLIAMS, et al., Appellants,
v.
CITY OF MINNEOLA, et al., Appellees.
No. 89-1819.
District Court of Appeal of Florida, Fifth District.
January 31, 1991.
Rehearings Denied March 8, 1991.
*685 Jack R. Elliott, Arfken & Elliott, Melbourne, for appellants.
Robert D. Vanhorne and Daniel J. Gerber, Rumberger, Kirk, Caldwell, Cabaniss, Burke & Wechsler, P.A., Orlando, for appellee Dwayne Lovell.
F. Scott Pendley, Dean, Ringers, Morgan & Lawton, Orlando, for appellee Joseph Brennan.
Jennings L. Hurt, III, and Vance R. Dawson, Rissman, Weisberg, Barrett & Hurt, P.A., Orlando, for appellees City of Minneola and Minneola Police Dept.
DAUKSCH, Judge.
This is an appeal from final orders granting summary judgment in favor of the appellees, defendants below, on all the tort theories alleged by the appellants. Because we determine that it would be possible for a jury to find that a tort was committed, we reverse and remand.
Fourteen year old Glenn Williams, the son of one of the appellants and the brother of the other, died of an apparent drug overdose. Officers of the Minneola Police Department considered it possible that the death resulted from suicide or foul play. *686 Officers Cason, Lameida, and Lovell participated in an investigation.
On November 29, 1986, the day after Glenn died, an associate of the Medical Examiner performed an autopsy which Officers Cason, Lameida, and Lovell attended at the direction of Minneola Police Chief Joseph Brennan. Officer Cason, on orders from Chief Brennan, took 35mm still photographs of the autopsy to preserve and document any physical evidence which might assist in the investigation of the death. Officer Lovell, using a borrowed video camera, made an approximately hour long videotape of the autopsy.
The officers took the videotape to Chief Brennan's home, where the men watched about five minutes of it.[1] Officer Lovell then took the tape home with him. Chief Brennan stated that he was shocked when he learned about the videotaping, and that he had told Lovell to put the tape in the evidence locker. Lovell testified that he had the chief's consent to take the tape home.
The next evening, at Lovell's home, the tape was viewed by Lovell, Officer Poole of the Mascotte Police Department (from which the video camera had been borrowed), Officer Davis of the Minneola Police Department (who stayed for only about ten minutes), and a man named John Warrington who had been invited to Lovell's house for dinner that evening and wanted to see the videotape. Lovell testified that he knew that Warrington had been a police officer and believed that he would soon be employed by the Minneola Police Department. Warrington was never professionally involved with the Minneola Police Department and had not worked as a police officer for six years.
On February 21, 1987, The Orlando Sentinel published an article describing the viewing at Lovell's home as having taken place in a party atmosphere where the audience joked and laughed. Earlier in February Chief Brennan had told the appellants about the videotaping and the viewing at Lovell's home. In deposition, Warrington denied making or signing a statement (not in evidence) allegedly made to the Minneola Police Department on February 25, 1987 which supported the newspaper's version of events. The four men who had been at Lovell's home that evening testified that the atmosphere had been professional, with no unseemly laughter or joking.
In a separate incident, Chief Brennan showed the still photographs of the autopsy to a man named Art Brewer, who was cleaning the chief's office. The pictures were on Chief Brennan's desk; he passed them to Brewer, asking, "Do you want something to eat?"
Glenn Williams' mother and sister (the appellants) sued the appellees on various theories, including intentional infliction of emotional distress, invasion of privacy, and tortious interference with a dead body.
The appellees' responses have centered on two points: (1) That the videotape and photographs were public records, making it impossible for anyone to commit an actionable tort by showing them to other people. (2) That in any event the facts do not constitute any tort recognized at law.

PUBLIC RECORDS
The videotape and photographs are public records pursuant to Florida's Public Records Act, Chapter 119, Florida Statutes (1987), because they were made in connection with the official business of a police department. See Mahone v. State, 222 So.2d 769 (Fla. 3rd DCA 1969); § 119.011(1), Florida Statutes (1987).
The appellees' contend that under no circumstances can anyone ever be liable in tort for display of a public record. That argument is based partly on the provision of section 119.07(1)(a), Florida Statutes (1987), that "Every person who has custody of a public record shall permit the record to be inspected and examined by any person desiring to do so ...", and partly on the last sentence of Article I, section 23 of the Florida Constitution
Right of privacy.  Every natural person has the right to be let alone and free *687 from governmental intrusion into his private life except as otherwise provided herein. This section shall not be construed to limit the public's right of access to public records and meetings as provided by law.
Subsection 119.07(3), Florida Statutes (1987), provides exemptions to the requirement that public records be made available for public inspection. One exemption is for certain "active criminal investigative information,"[2] but, contrary to the appellants' argument, the exemption does not prohibit the showing of such information. There are many situations in which investigators have reasons for displaying information which they have the option not to display.
By similar reasoning, we cannot agree with the appellants that a custodian violates the Public Records Act simply by displaying public records without having been requested to do so by a member of the public. The entire thrust of the Act is to permit access to public records upon request, but it does not impose a secrecy requirement which bars a custodian from displaying a public record entirely of his own volition.
We concur with the opinions which have held that neither a custodian of records nor a person who is the subject of a record can claim a constitutional right of privacy as a bar to requested inspection of a public record which is in the hands of a government agency. See, e.g., Michel v. Douglas, 464 So.2d 545 (Fla. 1985) (no federal or state right of privacy prevents access to public records, although "the right of access to public records is not the right to rummage freely through public employees' personal lives."); Forsberg v. Housing Authority of Miami Beach, 455 So.2d 373 (Fla. 1984); Shevin v. Byron, Harless, Schaffer, Reid and Associates, Inc., 379 So.2d 633 (Fla. 1980) (no federal or state disclosural right of privacy prevents a member of the public from seeing public records); Mills v. Doyle, 407 So.2d 348 (Fla. 4th DCA 1981).
Those cases deal with the public's right of access to examine public records in the custody of government personnel, and the principle that there is no constitutional right of privacy which prevents access upon request. We find, however, that neither the Public Records Act nor the Florida Constitution grants a custodian protection against tort liability resulting from that person's intentionally communicating public records or their contents to someone outside the agency which is responsible for the records unless (1) the person inspecting the records has made a bona fide request to inspect them, in accordance with the Public Records Act, or (2) it is necessary to the agency's transaction of its official business to reveal the records to a person who has not requested to see them.
There is no law against gratuitously releasing public records, but neither will the law protect from civil liability custodians of public records who unnecessarily and perhaps abusively or maliciously reveal such records to persons outside the agency which controls the records. "Custodians" refers to all agency personnel who have it within their power to release or communicate public records.[3]
The reference to public records in Article I, section 23 of the Florida Constitution appears to guarantee the absolute right to inspection and examination of public records which are not subject to some statutory exception, but there is no indication that the section was intended to give license to individuals, be they agency personnel or members of the public who inspect public records, to do whatever they please with public records with immunity from all the safeguards for individual rights which the common law has painstakingly developed over the centuries. It would serve no useful social purpose, would contradict the constitutional intent to protect citizens *688 from government intrusions into privacy, and would be contrary to logic and to the moral precepts which underlie our legal system, if an individual could lose his protection against such torts as invasion of privacy and infliction of emotional distress merely because certain information happened to get into the hands of a government agency.
Florida's policy underlying the Public Records Act is to hold governmental agencies, their officials, and their employees publicly accountable for their own actions. "The purpose of the Public Records Act is to promote public awareness and knowledge of governmental actions in order to ensure that governmental officials and agencies remain accountable to the people." Forsberg, 455 So.2d at 378 (Fla. 1984), Justice Overton, specially concurring in result. Justice Overton emphasized that it remained an open question whether misuse of public records could result in civil liability:
Because the proper parties and facts are not before this Court, I would not address the issue of whether a civil action for invasion of privacy could be maintained against persons who use personal, intimate information contained in tenant files for strictly private purposes totally unconnected with governmental accountability, but would recognize that this could be a justiciable issue in a future proceeding.
455 So.2d at 375.
Justice Overton wrote that section 23 may not be construed "in a manner which would impair the public's right of access to public records and meetings to assure governmental accountability," 455 So.2d at 378, but he advocated the importance of a balancing test involving the right of privacy and the public's right to open government and public records. 455 So.2d at 375-76.[4]
The goal of greater governmental accountability would not be furthered if the Public Records Act were transformed into a conduit for making public the private lives of persons who do not work for the government. It would be a perversion of public policy if the Act, intended to enable citizens to examine the inner workings of their government, became a shield for tort-feasors.
Without such an interpretation of the law as we have stated here, an agency employee could, using public records, embark on a calculated and malicious campaign to harm, without legal justification, another person, and do so with complete immunity from civil suit. Outrageous mass mailings could reveal humiliating details of an individual's private life in which the public has no legitimate interest. An agency employee could not only frivolously display pictures of a recently deceased child (as is alleged in this case) but could enlarge a photograph of the dead body to poster size and parade it through the streets  all without fear of tort liability.
We therefore hold that the appellees are not immunized from tort liability by the mere fact that the pictures were public records. It is a question for the jury whether bona fide requests for examination of the videotape and photographs were made by persons outside the agency. If such requests were made, and the custodians' compliance with those requests did not willfully involve a greater degree of publicity than was necessary to comply, then the appellees cannot be liable in tort for having obeyed the Public Records Act. If there was no request for examination, then the jury question remains whether it was necessary to the transaction of the agency's business to display the records to the persons to whom they were shown in the manner in which they were shown. If it was necessary, then the appellees are protected from tort liability. If it was unnecessary, then the appellees are not protected from tort liability by the Public Records Act nor by Article I, section 23 of the Florida Constitution.

TORTIOUS INTERFERENCE WITH A DEAD BODY
This theory must fail simply because the appellees did not interfere with a *689 dead body. An invariable component of the tort is some action affecting the physical body itself, such as removing it, withholding it, mishandling it, mutilating it, or preventing its proper burial. See, e.g., Restatement (Second) of Torts § 868; Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950); Dunahoo v. Bess, 146 Fla. 182, 200 So. 541 (1941); Halpin v. Kraeer Funeral Homes, Inc., 547 So.2d 973 (Fla. 4th DCA 1989), rev. den., 557 So.2d 35 (Fla. 1990); Smith v. Telophase National Cremation Society, Inc., 471 So.2d 163 (Fla. 2d DCA 1985); Sherer v. Rubin Memorial Chapel, Ltd., 444 So.2d 1176 and 452 So.2d 574 (Fla. 4th DCA 1984).
Publication of a photograph of a body does not, in the absence of a showing of actionable trespass on the body as such, amount to an interference with the possessory or burial rights of another. Abernathy v. Thornton, 263 Ala. 496, 83 So.2d 235 (Ala. 1955); Kelley v. Post Publishing Co., 327 Mass. 275, 98 N.E.2d 286 (Mass. 1951).

INVASION OF PRIVACY
There are two basic problems with the appellants' invasion of privacy theories:[5]
First, the publicity given to private facts must be to the public at large or to so many persons that the matter must be regarded as substantially certain to become public knowledge. Restatement (Second) of Torts § 652D, Comment a. See also Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311 (11th Cir.1989); Santiesteban v. Goodyear Tire & Rubber Co., 306 F.2d 9 (5th Cir.1962); Lewis v. Snap-on Tools Corp., 708 F. Supp. 1260 (M.D.Fla. 1989). Even though a defendant may become liable through revealing the matter to only one person, from whom the information predictably goes to many  as in Beaumont v. Brown, 401 Mich. 80, 257 N.W.2d 522 (Mich. 1977)  in the case before us very few people were involved, and there was no substantial certainty that because of the appellees' actions the pictures of the autopsy would be publicly disseminated.
Second, an invasion of privacy action of the category involved here can be brought only by a living person whose own privacy is invaded. "Except for the appropriation of one's name or likeness, an action for invasion of privacy can be maintained only by a living individual whose privacy is invaded." Restatement (Second), Torts § 652I. "Comment a" to section 652I states that the action is a personal right, peculiar to the individual whose privacy is invaded, and that the cause of action cannot be maintained by members of the individual's family unless their own privacy is invaded along with his. Furthermore, "Comment b" indicates that in the absence of statute, the action for invasion of privacy cannot be maintained after the death of the individual whose privacy is invaded.
We agree with Loft v. Fuller, 408 So.2d 619 (Fla. 4th DCA 1981), rev. denied, 419 So.2d 1198 (Fla. 1982), that an exception occurs when plaintiffs experience an independent violation of their own personal privacy rights other than the violation alleged to have occurred indirectly by virtue of the publicity given to the deceased, and we cannot say as matter of law that such an exception might not apply in this case. While recognizing the hazards of the exception, we concur with the Fourth District that there is no absolute prohibition against such actions.
There are cases which support the view that under certain circumstances the deceased's relatives may recover for the invasion of their own privacy interests even though they were not personally the focus of the publicity in question. [citations omitted] The rationale behind these decisions is that the relatives of the deceased have their own privacy interest in protecting their rights in the character *690 and memory of the deceased as well as the right to recover for their own humiliation and wounded feelings caused by the publication.
.....
We are wary of a blanket rule barring all relatives of a deceased from bringing a common law invasion of privacy action simply because the relatives were not directly involved in the publicity. However, in our view such relatives must shoulder a heavy burden in establishing a cause of action. When there are unusual circumstances ... it may be that a defendant's conduct towards a decedent will be found to be sufficiently egregious to give rise to an independent cause of action in favor of members of decedent's immediate family.
Id.
Among egregious situations envisioned in Loft was the display of grotesque pictures of a deceased's body (id.). Nevertheless, in view of the limited display of the videotape and the photographs in the instant case, we cannot say that the trial court committed reversible error in granting summary judgment for the appellees as to their right of privacy claims, whether common law, constitutional, or under 42 U.S.C. § 1983.

INTENTIONAL OR RECKLESS INFLICTION OF EMOTIONAL DISTRESS
We hold that a cause of action in tort for reckless infliction of emotional distress can lie for outrageous conduct involving pictures of the dead body of a plaintiff's spouse, child, sibling or parent, even though the plaintiff was not present at the display of the pictures and the allegedly tortious conduct did not physically impact the plaintiff, whether or not the emotional distress in turn caused physical harm to the plaintiff.
The limits on standing to sue in such a case are necessarily arbitrary, but a line must be drawn somewhere, and we hold that persons have standing to sue for this tort if they occupied the role of spouse, child, sibling or parent to the deceased.

The Independent Tort of Outrageous Conduct Causing Severe Emotional Distress.

The Florida Supreme Court first explicitly recognized the independent tort called intentional infliction of emotional distress (as contrasted with emotional distress as an element of damages caused by another tort) in Metropolitan Life Insurance Co. v. McCarson, 467 So.2d 277 (Fla. 1985), adopting Section 46, Restatement (Second) of Torts (1965) as the appropriate definition. That section provides:
One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.
Metropolitan Life Insurance stated that the defendant must have intended to inflict emotional distress, or must have acted with an intent which is tortious or criminal, or must have engaged in conduct characterized by "malice" or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.
We agree with the Third District when it stated that the cause of action should more appropriately be called "outrageous conduct causing severe emotional distress" because it could involve either the deliberate or reckless infliction of mental suffering. Dominguez v. Equitable Life Assurance Society of the United States, 438 So.2d 58, 59 (Fla. 3d DCA 1983), approved, 467 So.2d 281 (Fla. 1985).
We think describing the tort as "the intentional infliction of severe mental or emotional distress" is somewhat misleading. Such a description erroneously suggests that the defendant intended to inflict severe mental or emotional distress when, in fact, all that need be shown is that he intended his specific behavior and knew or should have known that the distress would follow.
Id.
This court explained the elements of a cause of action for intentional infliction of emotional distress in Dependable Life Insurance *691 Co. v. Harris, 510 So.2d 985 (Fla. 5th DCA 1987):
(a) deliberate or reckless infliction of mental suffering; (b) outrageous conduct; (c) the conduct must have caused the emotional distress; and (d) the distress must be severe.
510 So.2d at 986. See also Campbell v. Prudential Insurance Co., 480 So.2d 666 (Fla. 5th DCA 1985) and Food Fair, Inc. v. Anderson, 382 So.2d 150 (Fla. 5th DCA 1980). In our recent opinion in Lashley v. Bowman, 561 So.2d 406 (Fla. 5th DCA 1990), we discussed the nature and elements of the tort, quoting comment d to section 46 of Restatement (Second) of Torts (1965):
The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by `malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, `Outrageous!'

Outrageousness and Recklessness.
Outrageousness is the threshold test for recovery. Ponton v. Scarfone, 468 So.2d 1009 (Fla. 2d DCA), rev. denied, 478 So.2d 54 (Fla. 1985). The prerequisite of extreme behavior, beyond all bounds of decency, atrocious and utterly intolerable in a civilized community, has been discussed in numerous cases, including those in which District Courts of Appeal recognized the independent cause of action for infliction of emotional distress before our supreme court did. See Habelow v. Travelers Insurance Co., 389 So.2d 218 (Fla. 5th DCA 1980); Food Fair, Inc. v. Anderson; Lay v. Roux Laboratories, Inc., 379 So.2d 451 (Fla. 1st DCA 1980).
As for what is outrageous or reckless and what is not, we emphasize that our society, as reflected for example in decisions of the courts of Florida cited earlier in this opinion, shows a particular solicitude for the emotional vulnerability of survivors regarding improper behavior toward the dead body of a loved one, and the special deference paid by courts to family feelings where rights involving dead bodies are concerned is central to our decision.[6] This area is unique, and once it is entered, behavior which in other circumstances might be merely insulting, frivolous, or careless becomes indecent, outrageous and intolerable.
One obvious reason is that the bereaved are already suffering psychic trauma because of the loss of the loved one and are especially sensitized to any disrespect or indignity directed at the deceased's body or a representation of it. The potential for severe emotional distress is enormously increased in that situation. All of this is well known to the ordinary person, and so a level of carelessness or callousness which might not be considered tortious in other situations can show outrageousness and recklessness when a dead body or a picture of a dead body is involved.
Our reasoning echoes Kirksey v. Jernigan:
The right to recover, in such cases [tort cases where no physical injury is involved but the wrongful act reasonably implies malice, or, from the entire want of care of attention to duty, or great indifference to the persons, property, or rights of others, such malice will be imputed as would justify the assessment of punitive damages], is especially appropriate to tortious interference with *692 rights involving dead human bodies, where mental anguish to the surviving relatives is not only the natural and probable consequence of the character of wrong committed, but indeed is frequently the only injurious consequence to follow from it.
45 So.2d at 189. (Emphasis supplied).
In determining whether the element of outrage may be established, an appellate court must look at the evidence in the light most favorable to the alleged sufferer of emotional distress. Mallock v. Southern Memorial Park, Inc., 561 So.2d 330 (Fla. 3d DCA 1990); Dependable Life Insurance Company, 510 So.2d at 986. Whether the conduct is outrageous enough to rise to the level required by the tort may be decided as a question of law when the facts of a case can under no conceivable interpretation support the tort (see Dependable Life Insurance Company, 510 So.2d at 988),[7] but where significant facts are disputed, or where differing inferences could reasonably be derived from undisputed facts, the question of outrageousness is for the jury to decide. See Lashley v. Bowman; Mallock.
The appropriateness of factfinders determining what is "outrageous" is supported by our statement in Bowman that the standard of outrageousness set out in comment d to section 46 of the Restatement is almost impossible to apply in any consistent way essentially because outrageousness is a not only highly subjective, but also an extremely mutable trait.
This problem is exemplified by the high degree of inconsistency between (and within) courts about what is, at any given time or place, "outrageous!" ... Most of the examples contained in the Restatement comments do not overwhelm the reader with their "atrociousness" and "utter intolerability", which is not to say that these acts should not support a cause of action because they should.
561 So.2d at 409.

Intent and Foreseeability.
Under traditional principles of tort liability, the tort-feasor must either intend the wrongful result of his behavior, or, without intending harm, be able (as a reasonable person) to foresee that the result is certain or substantially certain to result, or he must simply act recklessly in deliberate disregard of a high degree of probability that the result will follow. See Eastern Airlines, Inc. v. King, 557 So.2d 574 (Fla. 1990); Restatement (Second) of Torts § 46, comment i.
Restatement (Second) of Torts § 500 defines "reckless" conduct.
The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.
Reckless disregard is the equivalent of intent. Food Fair; Dependable Life Insurance Co. (reckless infliction of mental suffering is the same as deliberate infliction). That is crucial to our holding in which we recognize a tort classified as "intentional" rather than "negligent" even though the tort-feasor may not have any intention of harming anyone.
Foreseeability is the guidepost of any tort claim, and breach of the duty to exercise reasonable care subjects one to liability to persons who may reasonably be foreseen to suffer damages as a result. Champion v. Gray, 478 So.2d 17 (Fla. 1985). One who recklessly and outrageously inflicts emotional distress can be liable if he knows that emotional distress is certain or substantially certain to result from his act. Ford Motor Credit Co. v. Sheehan, 373 So.2d 956 (Fla. 1st DCA), cert. dismissed, *693 379 So.2d 204 (Fla. 1979). Such knowledge, or reasonable foreseeability, can of course be proved by circumstantial evidence and need not depend on the unlikely possibility of an admission.
One who behaves outrageously with regard to pictures of a dead body can be presumed to know that severe emotional distress will be inflicted thereby on those who were closely related to the deceased, should those survivors become aware of the tort-feasor's behavior.[8] Such a situation is described in comment f to section 46 of the Restatement:
The extreme and outrageous character of the conduct may arise from the actor's knowledge that the other is peculiarly susceptible to emotional distress by reason of some physical or mental condition or peculiarity. The conduct may become heartless, flagrant, and outrageous when the actor proceeds in the face of such knowledge, where it would not be so if he did not know.
In the instant case, we find it to be a jury question whether it was reasonably foreseeable that the appellants would learn of the events involving the pictures of their dead family member. Taking into account such factors as the number of persons involved, who they were, and the community and the particular locations where the events took place, we cannot hold as a matter of law that the element of foreseeability is foreclosed from jury consideration.

Physical Impact or Injury Not Required Where Conduct is Reckless and Outrageous.

Where infliction of emotional distress is a result of negligence, and not of intent or its equivalent in recklessness, there are requirements, in one form or another, that the plaintiff prove that he or she was physically affected by the incident, even in cases where it was another person's injury which caused the plaintiff's emotional distress. For example, see Crane v. Loftin, 70 So.2d 574 (Fla. 1954).
But the "impact" rule is unrelated to emotional distress cases where intentional conduct or its equivalent is involved. That was true before our supreme court recognized the independent tort based on infliction of emotional distress, and it remains true today. In Eastern Airlines, Inc. v. King, Chief Justice Ehrlich, specially concurring, wrote to clarify the import of a quotation contained in the majority opinion:
This quote should not be taken to mean that impact or a physical manifestation of psychological trauma is required in connection with the tort of intentional infliction of emotional distress.
This Court has long recognized the tort of negligent infliction of emotional distress where the distress is accompanied by physical impact... . More recently, in Champion v. Gray, 478 So.2d 17 (Fla. 1987), and Brown v. Cadillac Motor Car Division, 468 So.2d 903 (Fla. 1985), we modified, in some limited situations, the requirement of an impact in connection with a claim of negligent infliction of emotional distress.
.....
While there must be impact or an objectively discernible physical manifestation before a cause of action arising from simple negligence may exist, no requirement of impact or physical injury is contained in section 46 (of the Restatement (Second) of Torts (1965)).
.....
Where the psychic injury is based on simple negligence, proof of impact or objective physical manifestation affords a guarantee that the mental distress is genuine. Whereas, the clearly outrageous nature of the conduct necessary under section 46 serves as adequate assurance that the resulting mental disturbance is not fictitious. See W. Keeton, Prosser and Keeton on Torts, §§ 12 & 54 (5th ed. 1984). This distinction between causes of action based on negligent and intentional infliction of emotional distress was recognized by this Court in Brown. We noted that our holding in *694 that case that there is no cause of action within this state for psychological trauma alone resulting from simple negligence was not intended to disturb prior decisions of the district courts allowing such damages in intentional tort actions based on outrageous conduct.
557 So.2d at 579-80. (Emphasis supplied). See also Dominguez 438 So.2d at 60, footnote 5.
In Brown, the supreme court noted that its ruling that a person who suffers no physical injury as a result of an accident caused by the negligence of another cannot recovery for psychological trauma alone
... does not disturb any prior decisions allowing such damages in intentional tort cases. Some district courts recognize such damages in outrageous conduct cases. This Court, however, has not ruled on that issue.
468 So.2d at 904.
Eastern Airlines, Inc. v. King merely held that the plaintiff in that case had failed to state a claim for reckless or intentional infliction of emotional distress; it did not hold that impact or physical injury is required for recovery where a claim for reckless or intentional infliction of emotional distress is stated.
Paralleling our reasoning is the fact that tortious interference with rights involving dead human bodies has been flatly excluded from the "impact" rule. Halpin, 547 So.2d at 974, and cases cited therein. This principle supports our conclusion that the kind of reckless conduct and outrageousness sufficient to avoid the "impact" rule in emotional distress cases is especially readily found where pictures of a dead body are involved.

Presence or Absence of Plaintiffs When Outrageous Acts Take Place.

Several Florida cases have held that even where the requisite outrageousness occurred in the defendant's acts toward the original victim, the emotional distress felt by close relatives of that victim when they learned of the acts was not actionable if the relatives were not present during the acts and the defendant's conduct was not directed at the relatives. See M.M. v. M.P.S., 556 So.2d 1140 (Fla. 3d DCA 1989), rev. den., 569 So.2d 1279 (Fla. 1990); Harrington By and Through Harrington v. Pages, 440 So.2d 521 (Fla. 4th DCA 1983); Habelow v. Travelers Insurance Co., 389 So.2d 218 (Fla. 5th DCA 1980). Those opinions did not concern dead bodies or pictures of dead bodies and so did not call into operation the unique considerations which apply in such cases.
An exception is Crenshaw v. Sarasota County Public Hospital Board, 466 So.2d 427 (Fla. 2d DCA 1985), which held that the mother of stillborn child could not recover when she did not see her dead child's body after it was accidentally mutilated, and the mother was not involved in the event. Crenshaw is distinguishable from the instant case because (1) the child was born dead and the mother never saw it, and (2) the acts which resulted in the linenwrapped body being sent to a laundry were entirely accidental (though negligent), and the person or persons responsible had no idea they were handling a corpse. To the extent, if any, that Crenshaw conflicts with our holding here, we decline to follow it.
A party moving for summary judgment must show conclusively the absence of any genuine issue of material fact, and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. If the evidence will permit different reasonable inferences, it should be submitted to a jury. Moore v. Morris, 475 So.2d 666 (Fla. 1985); Lashley v. Bowman.
We hold that the appellants have stated a cause of action for outrageous infliction of emotional distress by reckless conduct in connection with pictures of a dead body, and that the facts before the trial court did not preclude as a matter of law the possibility of a jury verdict in the appellants' favor (that is to say, a jury reasonably could find intentional infliction of emotional distress upon a proper evidentiary basis). We further hold that it is a jury question whether the appellees are protected from tort liability by the Public *695 Records Act. We therefore reverse the summary judgments and remand for further proceedings consistent with this opinion.
REVERSED and REMANDED.
GOSHORN, J., concurs.
GRIFFIN, J., concurs in part, dissents in part with opinion.
GRIFFIN, Judge, concurring in part and dissenting in part.
I concur in the conclusion of the majority that summary judgment was improvidently entered in favor of the individual defendants against Linda Williams; however, I disagree that the tort of interference with a dead body is not applicable to the facts of the present case. In so doing, I recognize there are no cases finding the exhibition of photographs of a dead body to constitute such interference; nevertheless because it is clear that the revulsion directed at the appellee's conduct in this case centers on exhibition of photographs of the boy's dead body, I believe this is the tort that is most apt. If appellees had shown photographs of the dead boy's clothing, or even his diary, there would be no tort here. Exhibition of the dead body, through videotape, is the tort.
Although the line of authority is not straight and true, there is little question that courts of all jurisdictions, including Florida, have long recognized and honored the expectation of society that the bodies of dead human beings be treated with respect. This expectation is likely more anthropological than sociological and is so deeply felt that its rationality is irrelevant. Because, as one judge expressed it, "the tenderest feelings of the human heart center around the remains of the dead",[1] the law acknowledges these peculiar sensibilities and recognizes a damage remedy, including recovery for pain and suffering of the survivors, where a dead body is wrongfully interfered with. Restatement (Second) of Torts § 868.
In Kirksey v. Jernigan, 45 So.2d 188 (Fla. 1950), the Florida Supreme Court expressed recognition of this very specific category of harm:
The right to recover, in such cases, is especially appropriate to tortious interference with rights involving dead human bodies, where mental anguish to the surviving relatives is not only the natural and probable consequence of the character of wrong committed, but indeed is frequently the only injurious consequence to follow from it.
Id. at 189.
Appellees contend the tort of interference with a dead body has no application to the facts of the present case because the dead body of Glenn Williams itself was not touched, harmed or exhibited. Appellees also assert that only those acts which in some way interfere with the survivor's property interest in proper disposition of the corpse are within the scope of this tort. As to this latter argument I simply note that section 868, Restatement (Second) of Torts (1979) expressly provides several alternative bases for liability:
One who intentionally, recklessly or negligently removes, withholds, mutilates or operates on the body of a dead person or prevents its proper interment or cremation is subject to liability to a member of the family of the deceased who is entitled to the disposition of the body.
The language of section 868 of the Restatement concededly suggests that interference with physical remains is contemplated; there is no reference to film or photographs of the body. Assuming appellees had taken the body of Glenn Williams to exhibit to their friends and coworkers at their home, instead of showing the videotaped pictures of that same body, recovery for damages in tort for interference with a dead body would clearly be available to Glenn's mother. I do not perceive a material difference between public exhibition of the videotape of the body and exhibition of the body itself.[2] No more than this boy's mother would be required to acquiesce if these police officers invited their friends *696 and neighbors to go over to the morgue and observe her son's autopsy is she required to acquiesce in the exhibition of a videotape of the same thing. Because the injury here is exactly what Kirksey v. Jernigan referred to, i.e., an act involving a corpse whose only injurious consequence is the mental anguish of the surviving relatives, it seems obvious that one of the unspecified "rights involving dead bodies" to which the Florida Supreme Court alluded in Kirksey v. Jernigan would include the right to limit or prevent either the filming or publication of film of the dead body in an autopsied state. Thus, I believe exhibition of the videotape of Glenn Williams' body being autopsied, if it had no connection to any purpose authorized by law,[3] is a tortious interference with the survivor's property right and interest in protecting the dignity of the dead body until it is properly interred or cremated.
NOTES
[1] The Minneola Police Department had no video camera or video player.
[2] § 119.07(3)(d), Florida Statutes (1987).
[3] We do not deal in this case with the issue of possible tort liability of those who obtain public records from custodians and misuse them, and so we need not revisit our opinion in Boyles v. Mid-Florida Television Corp., 431 So.2d 627 (Fla. 5th DCA 1983), approved, Mid-Florida Television Corp. v. Boyles, 467 So.2d 282 (Fla. 1985).
[4] We do not apply a balancing test here because the issue is not denial of requested access, but the potential civil liability of custodians for gratuitous distribution.
[5] Of the four categories of invasions of privacy  unreasonable publicity about private life, unreasonable intrusion upon seclusion, appropriation of name or likeness, and publicity that places one in a false light before the public  only the first might be applicable in the instant case. See Restatement (Second), Torts, section 652A. "One who gives publicity to a matter concerning the private life of another is subject to liability to the other for invasion of his privacy, if the matter publicized is of a kind that (a) would be highly offensive to a reasonable person, and (b) is not of legitimate concern to the public." Id. at section 652D.
[6] Although "outrageousness" refers to the attitude of society toward what is done, while "recklessness" refers more to the attitude of the tortfeasor toward what he is doing, both factors are affected by the involvement of the dead in the tort.
[7] Baker v. Florida National Bank, 559 So.2d 284, 287 (Fla. 4th DCA 1990), states that the issue of outrageousness "is a legal question in the first instance for the court to decide as a matter of law."
[8] The presumption could be overcome by proof of extraordinary circumstances.
[1] Lamm v. Shingleton, 231 N.C. 10, 55 S.E.2d 810, 813 (N.C. 1949).
[2] Cf. Fitzsimmons v. Olinger Mortuary Ass'n, 91 Colo. 544, 17 P.2d 535, 536-537 (Colo. 1932). The two cases cited in the majority opinion involving photographs of dead bodies are old and involved newspaper publication, neither arose in Florida, neither involved exhibition of the film of an autopsy, and perhaps, most important, in neither was the alleged tortfeasor the person entrusted by the survivor with access to the body. In Fitzsimmons v. Olinger Mortuary Ass'n, supra, the publication of a photograph of the dead body was found to violate an implied contractual duty between the survivor and the mortician. In the present case, the appellee's right of access to the body (if any) was statutory and a similar implied duty to protect the corpse and respect the survivor's feelings arose.
[3] See § 406.11, Fla. Stat. This videotape was not requested or made by either the medical examiner or the state attorney. It was never made a part of the medical examiner's file. Depending on whose version of the testimony you accept, some person working for the Minneola Police Department decided to film the autopsy, yet no consent to do so was obtained from the mother and no warrant applied for. Thus, it is arguable that this document does not even meet the "public record" definition of section 119.011(1), Florida Statutes.