# Third District Court of Appeal

## State of Florida

Opinion filed January 7, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D24-1701
Lower Tribunal No. 23-21240-CA-01
_____


**Brandon Molinet, et al.,**

Appellants,

vs.

**Van Orsdel Family Funeral Chapels, Inc., et al.,**

Appellees.


An Appeal from the Circuit Court for Miami-Dade County, Valerie R. Manno Schurr, Judge.

Wallen | Kelley, and Todd L. Wallen and Lee Alhanti, for appellants.

Conroy Simberg, and Megan Powell and Hinda Klein (Hollywood), for appellee Van Orsdel Family Funeral Chapels, Inc.


Before SCALES, C.J., and EMAS and LOGUE, JJ.

LOGUE, J.

In this appeal, Brandon, Michael, and Christiane Molinet appeal the trial court's final summary judgment in favor of Van Orsdel Family Funeral Chapels, Inc. on their claims for tortious interference with a dead body and negligent infliction of emotional distress. We affirm the trial court's grant of summary judgment as it relates to the Molinets' claims seeking to recover non-economic damages for emotional distress because the trial court correctly concluded the Molinets failed to establish that Van Orsdel engaged in wanton, malicious, or outrageous conduct. As it relates to the Molinets' claim for economic damages for tortious interference with a dead body, however, we reverse because the Molinets' claim was based on alleged violations of the Florida Funeral, Cemetery, and Consumer Services Act ("Funeral Act"), which does not require a showing of malicious conduct for recovery.

**BACKGROUND**

On September 27, 2022, William G. Molinet was admitted to Jackson Memorial Hospital. He passed away three days later. William was survived by his two adult children, Brandon and Michael, and his sister, Christiane (collectively, "the Molinets"). When he was admitted to the hospital, however, William provided the name and phone number of his ex-wife, Lory Molinet, as his next of kin. The hospital attempted to contact Lory after William died

2

but was not able to reach her. Having no additional information regarding William's survivors, the hospital did not contact them.

At the time of his death, William had been living at a rehabilitation facility for chronic alcohol and substance abuse, which he struggled with for most of his life. Prior to that, he led a transient lifestyle. As a result, the Molinets did not immediately notice William was missing. After several weeks of not hearing from him, however, they became concerned and tried to find him. After searching on their own for about a month, the Molinets hired a private investigator who led them to discover William had died at the hospital.

During this time, the hospital had been storing William's remains. On October 28, 2022, however, the hospital ran out of space in its morgue. As a result, the hospital transferred William's remains to Van Orsdel for storage pursuant to an agreement between the hospital and Van Orsdel that provided Van Orsdel would store the hospital's overflow bodies in its refrigeration unit. Van Orsdel's corporate representative testified that the hospital verbally instructed it not to contact any decedent's family as part of this agreement. The corporate representative also testified that because the bodies were only being stored as overflow for the hospital, Van Orsdel believed the bodies were still the hospital's responsibility and, therefore, any contact from the

funeral home could be construed as solicitation for funeral services, which was statutorily prohibited.

Van Orsdel's corporate representative further testified Van Orsdel did not believe it needed any special permission to transport and store the bodies because it was acting pursuant to its agreement with the hospital, at the hospital's express request, and with its permission. Van Orsdel considered the hospital to be the legally authorized person for consenting to transfer the remains to Van Orsdel for storage.

William's body was transported from the hospital to Van Orsdel in an unrefrigerated truck by a third party hired by Van Orsdel. When Van Orsdel received William's body, he was wrapped in the same material the hospital wrapped him in when he died. At Van Orsdel, the body was logged in and placed in Van Orsdel's refrigeration unit. As part of its login process, Van Orsdel verified the identity of the body using the toe tag and the decedent information form received from the hospital, and it checked the decedent for any personal belongings. In the decedent information form it received from the hospital for William, the form stated, "No NOK," which Van Orsdel understood to mean "No next of kin," under the sections labeled "Contact Information" and "Additional Info."

4

Van Orsdel recorded the intake details in its logbook. If the intake personnel observed anything noteworthy, that would be included in the log. Moreover, Van Orsdel's procedures specifically required that its employees contact management if the deceased had the appearance or smell of decomposition. Van Orsdel's records did not indicate that William's body was in a deteriorated state when it arrived at Van Orsdel.

After intake, Van Orsdel stored William's body in its refrigeration unit and did not move the body until it was claimed. Van Orsdel's refrigerators were always set at or below 40 degrees Fahrenheit and Van Orsdel's standard procedure was to check the temperature display on the front of the units near the door at least once per day, although Van Orsdel did not produce any logs in this regard. Van Orsdel's facilities were also randomly inspected by the State for compliance with relevant statutes every couple of months and neither the State nor Van Orsdel had ever found any issues with the refrigerators.

After learning of William's death, the Molinets hired their own funeral home to provide funeral services. The hospital notified Van Orsdel to release William's body to the Molinets' chosen funeral home, which took possession of William's body from Van Orsdel almost two months after William died. The embalming team at the Molinets' chosen funeral home evaluated the body

and recommended cremation because the body was not presentable enough for an open casket funeral after two months of storage. The funeral director for the Molinets' chosen funeral home explained that this likely meant "there would have been some condition that made it not feasible, or, you know, desirable for the family to view the human remains at that point." There was no evidence, however, of the level of decomposition of William's body when it arrived at Van Orsdel or when it left, nor were there any photographs or documentation of the condition by the Molinets' chosen funeral home after receiving William's body. The funeral director also did not personally see the remains, nor did the Molinets.

The funeral director for the Molinets' chosen funeral home testified that it was not a storage facility's job to assess a body's condition, and that this only occurred after a family became involved and determined its next steps. The funeral director also testified, similar to Van Orsdel's corporate representative, that "refrigeration is not preservation" and the longer the wait for permission from a legally authorized person the greater the chance that the remains would decompose to a point where they were no longer recognizable. The Molinets did not present any expert opinions regarding the state of decomposition of William's body, whether and to what extent that decomposition was normal for a body being stored for almost two months

6

without embalming, or whether it was caused by negligent storage or transportation.

The Molinets filed suit against Van Orsdel and alleged claims of tortious interference with a dead body and negligent infliction of emotional distress. The Molinets accused Van Orsdel of, among other things, transporting and storing William's body without the permission of his next of kin and failing to transport and store William's body properly. The tortious interference claim sought compensatory damages for extreme emotional distress and economic damages associated with finding William's remains and having to cremate him rather than having an open casket funeral. The emotional distress claim sought only non-economic damages for extreme emotional distress.

Van Orsdel ultimately moved for summary judgment, arguing that (1) Florida's impact rule barred the Molinets' emotional distress claims because they did not suffer any physical injury; (2) the Molinets could not prove Van Orsdel acted willfully or maliciously for purposes of their tortious interference claim; (3) Van Orsdel had no statutory or contractual duty to contact William's next of kin, as they merely acted as overflow storage for the hospital; and (4) there was no evidence Van Orsdel violated any statute.

The Molinets responded that impact was not required for their emotional distress claim where there was willful or wanton misconduct. They further argued there was a dispute of fact as to whether Van Orsdel's conduct was willful or wanton. The Molinets also contended there was no impact or willful or wanton misconduct requirement for recovery of economic damages they sought pursuant to the Funeral Act, as they alleged Van Orsdel intentionally and knowingly violated section 497.152(8)(c), Florida Statutes, requiring consent from a legally authorized person before receiving a corpse, and section 497.386(2), Florida Statutes, regarding the condition the body was to be maintained.

The trial court granted summary judgment, concluding that the impact rule barred the Molinets' claims for tortious interference with a dead body, and that there was no evidence of willful or wanton misconduct to support the claims for emotional distress. This appeal followed.

## ANALYSIS

The Molinets argue on appeal that the trial court erred in granting summary judgment to Van Orsdel on their claims for tortious interference with a dead body and negligent infliction of emotional distress. As to their claim for tortious interference, the Molinets contend the trial court erred in concluding their claim for economic damages failed because they did not

8

demonstrate willful or wanton misconduct by Van Orsdel, as this was not required. They further argue the trial court erred in concluding their claims for emotional distress, which they sought under both their tortious interference with a dead body and their negligent infliction of emotional distress claims, failed because the record evidence establishes an issue of fact regarding whether Van Orsdel's conduct was willful or wanton.

I.    <u>Economic Damages for Violation of Florida's Funeral, Cemetery, and Consumer Services Act</u>

The trial court granted summary judgment in favor of Van Orsdel on the Molinets' claim for tortious interference with a dead body because, while it recognized that the "the absence of a physical impact does not bar" such a claim, the Molinets were still required to show that Van Orsdel "engaged in malicious conduct to support such a claim." The Molinets argue this was error because their claim for economic damages resulting from the negligent mishandling of William's body alleged violations of the Funeral Act, Ch. 497, Florida Statutes, which did not require evidence of "malicious conduct." <u>See</u> § 497.169(1), Fla. Stat. ("[A]ny person may bring a civil action against a person or company violating the provisions of this chapter . . . . Upon adverse adjudication, the defendant shall be liable for actual damages caused by such violation.").

Van Orsdel seems to concede this point on appeal, as it "acknowledges that Florida's impact rule does not bar claims for economic damages resulting from tortious interference with a dead body. Thus, the impact rule is not dispositive of the Molinets' claim for economic damages[.]"[1] Van Orsdel nevertheless argues the trial court's summary judgment should be affirmed based on the Tipsy Coachman Doctrine because the Molinets failed to demonstrate a genuine issue of material fact on the issue of whether Van Orsdel violated sections 497.152(8)(c) and 497.386(2) of the Funeral Act.

The problem with this argument, however, is that the trial court never evaluated these issues, nor did it make any findings in this regard. As such, we cannot do so in the first instance. See Rosich-Medina v. Chilaud, No. 3D25-1239, 2025 WL 3467151, at *3 (Fla. 3d DCA Dec. 3, 2025) ("The proceedings below did not address either of these points. As an appellate court, we are constrained from making these determinations in the first instance."); Tucker v. Ebadian, 338 So. 3d 384, 385–86 (Fla. 3d DCA 2022) ("An appellate court should not ordinarily decide issues not ruled on by the

---

[1] It is not clear whether Van Orsdel is similarly conceding the Molinets did not have to show that Van Orsdel "engaged in malicious conduct," which was the ultimate basis of the trial court's grant of summary judgment in this regard, but given Van Orsdel's remaining argument on this issue relies on the Tipsy Coachman Doctrine, it would appear that it has.

10

trial court in the first instance.") (internal quotation marks and citations omitted).

Accordingly, we reverse on this issue and remand for the trial court to determine whether there is a genuine dispute of material fact sufficient to warrant a jury trial regarding whether Van Orsdel violated sections 497.152(8)(c) and 497.386(2), or whether Van Orsdel is entitled to summary judgment as a matter of law.

II.     Non-Economic Damages for Emotional Distress

The Molinets argue the trial court also erred in granting summary judgment to Van Orsdel on their non-economic damages claims for emotional distress because there were issues of fact regarding whether Van Orsdel's conduct was willful or wanton. "An action for mental anguish based on negligent handling of a dead body requires proof of either physical injury or willful or wanton misconduct." Gonzalez v. Metro. Dade Cnty. Pub. Health Tr., 651 So. 2d 673, 676 (Fla. 1995) (emphasis added).

"Whether conduct is sufficiently willful or wanton or outrageous is typically a question of law." Williams v. Boyd-Panciera Fam. Funeral Care, Inc., 293 So. 3d 499, 501 (Fla. 4th DCA 2020) (citing Matsumoto v. Am. Burial & Cremation Servs., Inc., 949 So. 2d 1054, 1056 (Fla. 2d DCA 2006)). See also Williams v. City of Minneola, 575 So. 2d 683, 692 (Fla. 5th DCA 1991)

11

("Whether the conduct is outrageous enough to rise to the level required by the tort may be decided as a question of law when the facts of a case can under no conceivable interpretation support the tort[.]"). It must be evaluated on an objective basis. <u>Matsumoto</u>, 949 So. 2d at 1056. However, "where significant facts are disputed, or where differing inferences could reasonably be derived from undisputed facts, the question of outrageousness is for the jury to decide." <u>Williams</u>, 575 So. 2d at 692.

Willful or wanton misconduct involves "[m]alicious conduct . . . [that] would arouse resentment by an average member of the community, leading him or her to exclaim 'outrageous.'" <u>Halpin v. Kraeer Funeral Homes, Inc.</u>, 547 So. 2d 973, 974 (Fla. 4th DCA 1989). The Florida Supreme Court has further explained, quoting from the comments to Section 46 of the Restatement (Second) of Torts, that:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his

12

> resentment against the actor, and lead him to exclaim, "Outrageous!"

Metro. Life Ins. Co. v. McCarson, 467 So. 2d 277, 278–79 (Fla. 1985).

Here, the Molinets contend Van Orsdel's conduct was outrageous, and they argue there was a dispute as to whether Van Orsdel acted outrageously by failing to check the condition of William's body and failing to ensure that the body was stored at or below 40 degrees Fahrenheit. The Molinets contend Van Orsdel's representative testified Van Orsdel was contractually and statutorily required to maintain the body at or below 40 degrees Fahrenheit, and there was no evidence that anybody checked on either the condition of William's body or the temperature at which it was stored while it was on the premises. They further contend that when asked whether Van Orsdel had any other procedures in place "to ensure that the remains are stored properly in the refrigerator and at the correct temperature," Van Orsdel's representative stated: "Not that I know of."

The Molinets argue that given (1) the advanced state of deterioration of William's body when it left Van Orsdel, (2) that nobody even checked on the body's condition while at Van Orsdel, (3) Van Orsdel's inability to show that anyone verified that William's body was stored at the proper temperature, and (4) the lack of other procedures in place to ensure William's

13

body was stored at the proper temperature, a jury could reasonably conclude that Van Orsdel acted outrageously and in violation of section 497.386(2).

On this issue, however, the trial court got it right when it concluded "[t]here [was] simply nothing in the record that create[d] a triable issue Defendant Van Orsdel engaged in malicious conduct sufficient to support such a claim." First, there is no specific evidence of William's advanced state of deterioration when he left Van Orsdel as none of the Molinets observed the body. The testimony of the funeral director for funeral home where the Molinets had the body sent after Van Orsdel, moreover, provided only generalized testimony as he also did not personally observe the body.

Second, the Molinets' contention that nobody checked on the body's condition while at Van Orsdel does nothing to advance their claim of outrageous behavior. Van Orsdel's corporate representative testified to the procedure for intake of remains from the hospital, which included confirming identification and checking for any personal belongings of the decedents, but otherwise maintaining the decedents in the wrapping they arrived in and immediately placing them in refrigeration. Furthermore, Van Orsdel's corporate representative also testified that its intake procedure provided that if any appearance or smell of decomposition was detected, the intake personnel were to advise management immediately and this did not occur

14

here. Therefore, the inference is that no such state of decomposition was detected at intake.

As to the Molinets' third and fourth points – that Van Orsdel was unable to show that anyone verified that William's body was stored at the proper temperature and that there was a lack of other procedures in place to ensure his body was stored at the proper temperature – is belied by the testimony of Van Orsdel's corporate representative. Specifically, Van Orsdel's corporate representative testified that the temperature of its refrigerators was shown on a thermometer at the front and that these temperatures were checked at least once a day.

Furthermore, the cases relied on by the Molinets are easily distinguishable as they involve conduct that is not analogous to what occurred here. For example, the Molinets rely on a case in which the funeral home placed the wrong body in a casket and then attempted to convince the family it was the correct body. Halpin, 547 So. 2d at 973. The correct body was thereafter located and replaced, but the family was not satisfied with the decedent's appearance. Id. These facts are far different from what occurred here.

Similarly, Williams involved the videotape of an autopsy performed on a fourteen-year-old decedent, which was taken home by one of the officers

15

and shown to others in what was described as a "party atmosphere where the audience joked and laughed." <u>Williams</u>, 575 So. 2d at 686. Again, these facts are distinguishable from what occurred here. <u>Mellette v. Trinity Mem'l Cemetery, Inc.</u>, 95 So. 3d 1043, 1044 (Fla. 2d DCA 2012), in turn, involved a cemetery's actions in disinterring a body at the request of the decedent's mother, without the permission of the decedent's widow, and transferring the body to the mother for reburial in another state. These facts are wholly unrelated to what occurred here.

The only case relied on by the Molinets that is even remotely close to what occurred here concerns a federal district court order, <u>Jones v. Celebrity Cruises, Inc.</u>, No. 23-21481-CV-Williams, 2024 WL 3326891 (S.D. Fla. July 8, 2024), in which the district court denied summary judgment. In <u>Jones</u>, however, there was extensive evidence that nurses on board the cruise ship observed "distinct," "strong," and even "overpowering" odor coming from the ship's morgue, that they felt the body and the body felt warm despite being in refrigeration, and there was evidence that a sensor in the morgue's cooler had malfunctioned resulting in incorrect temperature readings. <u>Id.</u> at *2. There was also specific evidence regarding the state of the decedent's body when it arrived at the port and expert testimony regarding the state of decomposition of the body. <u>Id.</u> at *2, 4.

16

Here, in contrast, there was no specific evidence of the exact condition of William's body, nor was there any evidence that Van Orsdel employees observed any signs of decomposition when the body arrived or when it was retrieved. Finally, there was no evidence of any malfunction of Van Orsdel's refrigerators. This lack of evidence renders <u>Jones</u> distinguishable.

Accordingly, based on the foregoing, the trial court properly concluded there was nothing in the record that created a triable issue of fact regarding whether Van Orsdel engaged in wanton, malicious, or outrageous conduct sufficient to support the Molinets' claim for emotional distress. We therefore affirm the trial court's summary judgment in this regard.

Reversed in part, affirmed in part, and remanded for further proceedings.