475 So.2d 1309 (1985)
Donald W. YOUNG and Ol' Smokey Homes, Inc., a Florida Corporation, Appellants/Cross-Appellees,
v.
Michael M. JOHNSTON, Appellee/Cross-Appellant.
No. AX-79.
District Court of Appeal of Florida, First District.
September 25, 1985.
Rehearing Denied October 24, 1985.
*1310 Charles R. Gardner of Gardner, Shelfer & Duggar, Tallahassee, for appellants/cross-appellees.
F. Perry Odom and Mary L. Sweet of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for appellee/cross-appellant.
SMITH, Judge.
Appellant Ol' Smokey Homes, Inc. (Ol' Smokey) appeals a final judgment in favor of appellee Michael M. Johnston (Johnston) after a non-jury trial. Ol' Smokey contends that the trial court erred in finding that a contract existed between Ol' Smokey and Johnston, as well as in its measurement of damages resulting from the alleged breach. Johnston cross-appeals the trial court's damages award, maintaining that the award failed to compensate him for all of his losses occasioned by the alleged breach. We reverse the award on appeal, and partially reverse on the cross-appeal.
Although the parties insist upon certain conflicting variations in, and interpretative nuances of, the evidence, the critical facts bearing upon the issue of existence of a contract appear to be as follows: Johnston approached Donald W. Young (Young), President of Ol' Smokey Homes, Inc., in early January 1983 to discuss construction by Ol' Smokey of a residence on property owned by Johnston in Tallahassee, Florida. Young advised Johnston to have a floor plan and materials specification sheet drawn up, and to distribute them to other contractors, as well as to Ol' Smokey, in order to secure bids on the proposed residence. After doing so, Johnston informed Young that Ol' Smokey's bid of $67,731 was the lowest bid offered. Young next advised Johnston to attempt to secure a loan from Security First Federal Savings & Loan Association (Security First Federal) in order to finance construction of the residence. Acting on this advice, Johnston applied for a loan at Security First Federal on February 17, 1983. He was informed at this time that he would have to secure certain documentation and perform certain tasks before his loan application might be approved. The first two requirements  securing approval of his building plans by a local architectural control committee and paying the loan application fee  were completed by Johnston on February 17 and 24, 1983, respectively. A third requirement, acquiring homeowners insurance, was accomplished on March 30, 1983. The fourth and fifth requirements  acquiring a description of building materials needed for construction as well as a written contract of construction from Ol' Smokey  were accomplished by Johnston on February 21, 1983. However, Johnston was unable to meet the final requirement, that of securing Young's presence as builder at a loan-closing meeting at Security First Federal on April 6, 1983. Accordingly, Johnston *1311 was not able to close the loan commitment he tentatively negotiated with Security First Federal.
The sequence of events surrounding Young's failure to attend Johnston's loan closing was subject to some dispute below. As previously noted, on February 21, 1983, Johnston had acquired from Young a written proposal to build Johnston's residence. At this time, Johnston and Young mutually agreed to an increase in the construction price to $70,000 after Young had informed Johnston that the cost of materials had risen since Ol' Smokey's bid in January 1983. Although Young signed this contract on February 21, 1983, Johnston was unable to testify unequivocally as to when he signed the contract.[1] Johnston did testify that he subjectively felt certain that the parties had already reached an agreement at that time because he had informed Young that the only "loose end" remaining before the agreement would be finalized was the securing of his loan from Security First Federal. Young's testimony was that he felt that Johnston was still in the process of analyzing the various bids he had received, or that he was taking Young's advice to verify the cost increases Young had claimed justified Ol' Smokey's alteration of its initial bid, or both.
Johnston testified that he tentatively received his construction loan commitment from Security First Federal on March 24, 1983, advising Young of this fact on the same date. However, Young disputed this testimony. In any event, both agreed that Johnston did so inform Young on April 1, 1983, and further, that Johnston informed Young that final approval of the loan was conditioned on attendance of all parties, including Young as the prospective builder, at the formal closing scheduled for April 6, 1983. On cross-examination, Young admitted familiarity with this requirement of Security First Federal, based on prior dealings with that institution.
Young disputes Johnston's version of events leading up to the aborted loan closing. Johnston testified that Young stated that he "would" be at the closing; Young's testimony was that he "could" be there. What was undisputed was that Young did not attend the closing, with the result that Johnston failed to obtain the financing necessary for construction of the residence by Ol' Smokey.[2] On April 5, 1983, the day preceding the scheduled closing, Young called Johnston at his place of employment telling Johnston that Ol' Smokey would not be able to commence construction for at least four months. Johnston testified that his response to this news was "I'll have to think about this." Exactly what took place subsequent to the aborted loan closing date is also the subject of some dispute, but it fairly appears that the parties attempted for a time to reschedule a date when Ol' Smokey could begin construction of the residence. Young advised Johnston to seek out another builder to construct the residence, suggesting alternatively that timely commencement of construction would require Young to employ unfamiliar subcontractors whom he would not be able to personally supervise. These rescheduling efforts failed, and on May 24, 1983, Young informed Johnston that Ol' Smokey would not construct Johnston's residence "under any circumstances."
Johnston filed suit, alleging that Ol' Smokey's failure to construct the residence constituted a breach of contract.[3] The trial court heard two days of testimony, after which it issued a final judgment finding that Ol' Smokey and Johnston had in fact entered into a contract; that Ol' Smokey had breached this contract; and that as a result of this breach Johnston was entitled to damages in the amount of $11,700. This *1312 figure represented the difference between the construction price agreed to by Johnston and Ol' Smokey and the next lowest bid for construction of Johnston's residence, which was $81,700. The trial court rejected Johnston's claims for other items of damages, finding that these expenses would have been incurred by Johnston notwithstanding Ol' Smokey's breach.
Ol' Smokey raises five points on appeal. However, on close analysis two basic contentions emerge. First, Ol' Smokey asserts that the trial court erroneously found a contract to exist between the parties. It contends that while Ol' Smokey was aware that Johnston was considering it for construction of his residence, Johnston never unequivocally communicated his apparent final choice of Ol' Smokey to Young. Ol' Smokey maintains that any "acceptance" of Ol' Smokey's offer of construction was not binding because it "remained in the breast of the acceptor," Kendel v. Pontious, 261 So.2d 167 (Fla. 1972). Further, Ol' Smokey urges, even if the court accepts Johnston's contention that an oral acceptance was communicated, this could have occurred no earlier than April 1, 1983, when Johnston informed Young of the upcoming loan closing at Security First Federal, and that such an "acceptance" at this late date was unreasonably untimely. Secondly, Ol' Smokey asserts that even assuming, arguendo, the existence of a contract, Johnston suffered no actual damages from the breach because he never commenced construction through an alternative contractor. We find merit in Ol' Smokey's arguments.
Here, in support of the trial judge's ruling, Johnston confidently urges that a contract between the parties was properly found to exist based upon the combination of oral and written communications between Johnston and Young. Young, on behalf of Ol' Smokey, with equal certitude, insists that the parties merely engaged in a somewhat prolonged negotiation, with no definite, binding agreement ever coming into existence. Regardless of our characterization of the contentions of the parties, which are here abbreviated for purposes of getting to the factors which guide our decision, we find no basis for the existence of a contract necessary to support the award of $11,700 damages on the "benefit of the bargain" theory appearently applied by the trial court in reaching its decision.
It is obvious from the evidence before the trial judge, and as conceded by appellee's counsel at oral argument, that neither party contemplated that Johnston had any obligation to continue with the home-building project unless he received financing through a loan from Security First Federal Savings and Loan Association. See, Sheldon Builders, Inc. v. Trojan Towers, 255 Cal. App.2d 781, 63 Cal. Rptr. 425 (1968). Regardless of other points of disagreement as to what the agreement between the parties was and when and how it was made, it is certain that Johnston's commitment to any obligation under the contract was conditioned upon his completion of financial arrangements for payment. Until this occurred, neither party was ready, willing and able. There is no evidence that Johnston was ever committed to pursue the construction project to completion. There is nothing to indicate that performance would have been expected of Johnston in the event for any reason he was unable to secure financing, or simply declined to proceed with his loan application. If such requirement existed, it would necessarily have to be found somewhere in the contract between the parties, although we use the term "contract" here advisedly, since Johnston maintains that it consists of a combination of the written and oral communications of the parties. We can find no such express agreement between the parties, nor can it be implied from the circumstances present here. Johnston's failure to join in the execution of the written contract  or, if he did sign it prior to Young's termination of their negotiations, Johnston's failure to communicate this fact to Young  clearly evidences the tentative nature of the transaction between the parties. This being the case, we are compelled to conclude, as a matter of law, that the alleged contract was lacking in mutuality of obligation, so as to preclude recovery of damages for breach based on *1313 the "loss of bargain" at the time their negotiations came to an end.
It is basic hornbook law that a contract which is not mutually enforceable is an illusory contract. Howard Cole & Co. v. Williams, 157 Fla. 851, 27 So.2d 352 (1946). Where one party retains to itself the option of fulfilling or declining to fulfill its obligations under the contract, there is no valid contract and neither side may be bound. Miami Coca-Cola Bottling Co. v. Orange-Crush Co., 291 F. 102 (D.Fla. 1923), affirmed, 296 F. 693 (5th Cir.1924).
Pan-Am Tobacco Corporation, d/b/a Pan-Am Vend-tronics v. Department of Corrections, 471 So.2d 4 (Fla. 1984). See also, Ponce Development Company v. Espino, 449 So.2d 317 (Fla. 3d DCA 1984). Under the facts here, it is clear that Johnston never committed himself to go forward with the contract, but only to proceed, as he saw fit, to either obtain the financing essential to his performance and instruct Ol' Smokey to proceed with construction, or not, at his election. It was improper, therefore, to award damages to Johnston on a "loss of bargain" theory, where it does not appear at any time that Johnston subjected himself to liability to Ol' Smokey.
The usual rule in cases involving breach of a construction contract is found in Tuttle/White Constructors, Inc. v. Montgomery Elevator Co., 385 So.2d 98, 100 (Fla. 5th DCA 1980), which held that where there has been a breach:
... the non-defaulting party must show actual expenditures occasioned by the breach, and then the defaulting party may present evidence to prove waste, extravagance and lack of good faith. (citation omitted)
Stated differently, the rule in Florida is that when a contractor wrongfully breaches a construction contract, or abandons the construction, leaving it uncompleted, the owner is entitled to an award of the cost of completing the work in conformity with the contract and specifications, including the actual expenditures made in good faith as necessary to complete the job, Rousselle v. B & H Construction Co., Inc., 358 So.2d 614 (Fla. 1st DCA 1978); Sea Ledge Properties, Inc. v. Dodge, 283 So.2d 55 (Fla. 4th DCA 1973), cert. dismissed, 285 So.2d 618 (Fla. 1973); R.K. Cooper Builders, Inc. v. Free-Lock Ceilings, Inc., 219 So.2d 87 (Fla. 3d DCA 1969). The burden is first upon the owner to show that the job was completed at a reasonable cost, or in good faith; and the amounts actually expended must be proven with a reasonable degree of certainty, R.K. Cooper Builders, Inc., supra, 219 So.2d at 89. Even assuming a breach of contract by Young, the trial court's award of $11,700 damages here cannot be justified under this rule, since Johnston has not incurred actual expenditures of $11,700.00 as a result of Young's actions. An aggrieved party who has suffered no damages is entitled to a judgment for nominal damages only, AMC/Jeep of Vero Beach, Inc. v. Funston, 403 So.2d 602, 605 (Fla. 4th DCA 1981).
Notwithstanding our resolution of this controversy on the basis above set forth, we have considered the basis for Johnston's claim of "loss of bargain" damages. Johnston argues that under Florida law a non-breaching party to a construction contract has two alternative remedies: First, he can treat the contract as void and recover damages that would return him to the same position he was in prior to entering the contract; or second, he can affirm the contract, and insist on the benefit of his bargain by recovering damages that place him in the position in which he would have been had the contract been performed. McCray v. Murray, 423 So.2d 559 (Fla. 1st DCA 1982). Here, Johnston urges, he permissibly sought the second alternative, namely, the benefit of his bargain with Ol' Smokey, which was construction of a residence for $70,000. Accordingly, he contends, since the next lowest bid he received for construction of the same residence was $81,700, only an award of $11,700 would provide him with the benefit of his bargain with Ol' Smokey, citing Grossman Holdings, Ltd. v. Hourihan, 414 So.2d 1037 (Fla. 1982), which adopted Restatement (First), Contracts, Subsection 346(1)(a) as *1314 the law in Florida regarding breaches of construction contracts.[4]
However, neither Grossman Holdings nor McCray involved, as does this case, a situation where there were no actual expenditures in proceeding with the construction called for in the contract. Since neither party in this case had begun performance, the question arises whether loss of a purely executory construction contract for a private residence furnishes the basis for damages based upon the "loss of bargain" rule upon which appellee relies. We think not.[5] Even if Johnston may properly claim damages occasioned by Ol' Smokey's failure to go forward with the contract, the absence of any attempt on his part to seek substitute performance from another builder leaves to pure speculation the extent of any monetary harm actually suffered based upon a "loss of bargain" theory. We find no evidence in the record below suggesting that such otherwise speculative damages were within the contemplation of the parties. Tuttle/White Constructors, Inc. v. Montgomery Elevator Co., 385 So.2d 98, 100 (Fla. 5th DCA 1980). In substance, the damages awarded here were obviously calculated on a "profit" theory, where there was nothing to indicate that a profit motive influenced Johnston's decision to acquire a new house and to contract with Young for its construction. The evidence adduced is simply not susceptible to an interpretation justifying a loss of $11,700 in "profits" based upon the difference between construction estimates.
Appellee's reliance upon Davis v. Stow, 60 So.2d 630 (Fla. 1952), is misplaced. We agree with the proposition that recovery of damages for breach of construction contracts is not in every instance dependent upon a showing that an expenditure representing the item of damage has already been made. However, Davis v. Stow does not support the $11,700 award here, since the damage item recovered in Davis was based upon a "cost to cure" theory (cost of waterproofing a wall as called for under the contract) where the building had been completed and, presumably, payment of the contract price had already been made. Thus, the damage was real, not merely speculative. It should also be noted that the owner's claim of greater damages based upon an alternate theory (value "as is" as compared to value if the building had been properly constructed), was rejected by the Davis court because the evidence on disparity of value was so "speculative and obscure" as to afford no basis for a jury to intelligently assess damages on that theory, even if that was a proper test, a matter the court did not feel obliged to decide.
Nevertheless, Johnston is entitled to some, but not all, of the damages claimed on cross-appeal. Some of Johnston's expenditures were incurred on the strength of his putative contractual arrangement with Ol' Smokey. Johnston incurred expenses of $437.50 in seeking the loan commitment from Security First Federal, and on the theory of a "promissory estoppel," he should have been reimbursed *1315 for this expense by Ol' Smokey. 22 Fla. Jur.2d, Estoppel and Waiver, § 4, "Promissory estoppel." Also, he sought prejudgment interest on all recoverable expenses, an element of damages to which he is entitled upon appropriate proof, Diversified Commercial Developers v. Formrite, 450 So.2d 533, 535 (Fla. 4th DCA 1984). On the other hand, the trial court was correct in denying Johnston recovery of rental expenses incurred during his continued occupation of his old residence, and interest on a loan for purchase of the real estate on which the house would have been built, which appellee testified would have been paid off from the proceeds of the new loan. As the trial court concluded, the rental expense claimed would have been incurred in some from notwithstanding the breach of contract. The same applies to the real estate loan interest,[6] since appellee would have been merely substituting one interest obligation for another.
In summary, the trial court erred in awarding Johnston damages measured as the difference between the contract price and the cost of completion of the never constructed residence, but also erred in denying as a matter of law the other damages consisting of his actual expenditures in applying for the Security Federal loan, with prejudgment interest on such amount.
REVERSED and REMANDED for entry of judgment consistent with this opinion.
ZEHMER and BARFIELD, JJ., concur.
NOTES
[1] Johnston's testimony was self-contradictory; however, at one point he indicated that he signed the proposed contract on February 24, 1983. However, he also admitted that he did not communicate this fact to Young prior to the complete break-down of negotiations following the aborted loan closing.
[2] Johnston's preliminary loan commitment from Security First Federal expired on April 23, 1983.
[3] Donald W. Young was voluntarily dismissed as a party-defendant to this cause prior to entry of the appealed-from final order.
[4] Restatement (First), Contracts, Subsection 346(1)(a) provides:

... (1) For a breach by one who has contracted to construct a specified product, the other party can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:
(a) For a defective or unfinished construction he can get judgment for either
(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or
(ii) the difference between the value that the product contracted for would have had and the value of performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve economic waste.
[5] Cases from other jurisdictions involving similar fact patterns as found here differ, although no consistent measure of damages has emerged. See, Bell v. McCann, 535 P.2d 233 (Colo. App. 1975) (where contractor breached contract to construct house by not beginning construction, damages recoverable for difference between contract cost and fair market cost of erecting house); Ross v. Danter Associates, Inc., 102 Ill. App.2d 354, 242 N.E.2d 330 (1968) (same); see generally Annot., 76 A.L.R.2d 805, 858 (1961).
[6] This refers to a loan used for purchase of the lot upon which the house was to be constructed. It appears that this transaction preceded, and was separate and apart from Johnston's dealings with Ol' Smokey.