# Third District Court of Appeal

## State of Florida

Opinion filed May 31, 2017.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D15-2114
Lower Tribunal No. 10-63383
_____

**Deauville Hotel Management, LLC d/b/a Deauville Beach Resort,**
Appellant,

vs.

**Kemesia Boota Ward and Patrick James Ward,**
Appellees.

An Appeal from the Circuit Court for Miami-Dade County, Norma S. Lindsey, Judge.

Billbrough & Marks, P.A. and Geoffrey B. Marks, for appellant.

Faudlin Pierre, for appellees.

Before LOGUE, SCALES, and LUCK, JJ.

LUCK, J.

"Chapel of Love," the tune made famous by the Dixie Cups, celebrates how a couple's wedding day should feel like "Spring is here, the sky is blue/Birds all sing as if they knew . . . Bells will ring, the sun will shine, I'll be his and he'll be

mine." The Dixie Cups, Chapel of Love (Red Bird Records 1964). The birds, however, did not sing and the bells did not ring on Kemesia Boota Ward's wedding day. The hotel ballroom where she planned to have her wedding reception was closed by the city of Miami Beach, and the hotel moved the reception to its lobby. Ward's wedding day was "ruined," a "public spectacle," "cramped," and "very uncomfortable," and caused her to be "embarrassed," "cry[] uncontrollably," and have "nightmares." As a result, Ward and her husband, Patrick James Ward, sued the hotel that hosted and catered the wedding, Deauville Hotel Management, LLC, for breach of contract and intentional infliction of emotional distress.[1] The jury, after a five day trial, found for the couple on both claims and awarded Ward $23,000 and her husband $2,500 on their breach of contract claims, and the couple $5,000 for intentional infliction of emotional distress. The hotel contends on appeal that it did not breach the contract because it did not promise a specific location for the wedding within the hotel, the jury awarded more breach of contract damages than the facts supported, and its conduct was not outrageous enough for an intentional infliction of emotional distress claim. After reviewing the briefs, and with the benefit of oral argument, we affirm in part and reverse in part.

---

[1] Ward also sued for negligent and fraudulent misrepresentation but those claims are not at issue in this appeal.

*Factual Background and Procedural History*

On February 17, 2010, Ward signed the contract with Deauville to hold her wedding reception in the hotel's Richelieu ballroom on July 9, 2010. The contract did not specify in which room or area of the hotel the wedding would be held and, instead, referred to the "function space." The contract further stated that:

> Function space is assigned, and reassigned if needed, to accommodate both the GROUP and all other parties who are using the HOTEL facilities during the GROUP'S event dates. THE GROUP agrees to promptly notify the HOTEL of any changes in function space requirements and/or attendance.

The contract also contained the following provision regarding the hotel's cancellation policy:

> HOTEL'S CANCELLATION: If Hotel cancels this Agreement or is unable to provide the requested space, the Hotel will work with Group to arrange alternative space at the prices set forth herein. Hotel will arrange for comparable space in the same vicinity of the Hotel and shall provide, without charge, necessary transportation between the alternative site and the Hotel. Hotel's liability is limited to these remedies, and Hotel shall not be liable for any consequential, punitive or special damages.

Nine days before the Wards' wedding, on June 30, 2010, the city of Miami Beach red-tagged (i.e., shut down) the hotel's three ballrooms, including the Richelieu, as unsafe and in violation of certain building codes.[2] Deauville did not

---

[2] The red-tag the city put on the door of the Richelieu ballroom stated:

> UNSAFE BUILDING. This building or structure is, in the opinion of the building official, unsafe, as defined in 8-5, unsafe structures of the Miami-Dade County Municipal Code. This building shall be vacated,

3

inform the Wards of the shut down and, instead, staff was instructed to continue the preparations for the reception as planned. Meanwhile, Deauville attempted to have the red-tag removed. The next day after the city closed the ballrooms, the hotel sent a facsimile to the city's building department requesting a ninety-day extension of time for compliance. The extension was denied. On July 8, the day before the wedding, the hotel filed an emergency motion for temporary injunction against the city to allow access to the ballrooms. The hotel was again unsuccessful in its attempts to have the ballrooms reopened. Finally, an emergency inspection was conducted on the day of the wedding, but because no repairs had been made, the ballroom remained closed.

The Wards learned of the shutdown hours before their wedding on July 9. While the Wards were married in a ceremony off-site, the Deauville moved the reception to the "Napoleon Pre-function area," which is what the hotel called its lobby. The lobby, unlike the Richelieu ballroom, was too small for the 190 guests; the tables were "crammed" in the space; there was no privacy for the event; the disc jockey playing music was told numerous times to lower the volume; and hotel guests were walking through the wedding reception (some in their bathing suits) and participating in the reception (clapping during the introduction of the wedding party).

_____

not be occupied.

For ruining their wedding, the Wards sued the hotel for breach of contract (as to Ward), breach of a third-party beneficiary contract (as to her husband), and intentional infliction of emotional distress. The jury found in favor of Ward on her breach of contract claim, and awarded her $23,000 in compensatory damages. The jury also found that Ward's husband was a third-party beneficiary to the contract and suffered damages in the amount of $2,500. With respect to the intentional infliction of emotional distress claim, the jury found that the hotel engaged in extreme and outrageous conduct and awarded damages in the amount of $5,000. The trial court denied Deauville's post-trial motion for judgment in accordance with its directed verdict motion. This appeal followed.

*Standard of Review*

We review a denial of a motion for directed verdict de novo, viewing "all of the evidence presented and all available inferences from that evidence in the light most favorable" to the non-moving party. R.J. Reynolds Tobacco Co. v. Ballard, 163 So. 3d 541, 545 (Fla. 3d DCA 2015) (quotation omitted). "[A]n appellate court," in other words, "must affirm the denial of a motion for directed verdict if any reasonable view of the evidence could sustain a verdict in favor of the non-moving party." Meruelo v. Mark Andrew of Palm Beaches, Ltd., 12 So. 3d 247, 250 (Fla. 4th DCA 2009).

*Analysis*

5

Deauville appeals the trial court's denial of its post-trial motion for direct verdict on three grounds. The directed verdict motion should have been granted as to the breach of contract claims, Deauville contends, because: there was no breach as the contract between the hotel and Ward did not specify that the wedding would be held in the Richelieu ballroom; and the jury's damage award exceeded what the law allowed and the evidence supported. The hotel argues, as to the intentional infliction of emotional distress claim, that directed verdict should have been granted because its conduct was not, as matter of law, extreme and outrageous.

## 1. Breach of contract.

To prevail in a breach of contract action, a plaintiff must prove: (1) a valid contract existed; (2) a material breach of the contract; and (3) damages. See Murciano v. Garcia, 958 So. 2d 423 (Fla. 3d DCA 2007). Deauville contends that because the contract allowed it to reassign a space as needed and because "function space" was not defined as the Richelieu ballroom, the hotel did not breach the contract when it unilaterally moved the Wards' reception to the lobby of the hotel. Deauville's reading of the contract is an incomplete one.

The contract was unambiguous that it provided for an assigned, committed, and reserved function space. The contract provided that a "[f]unction space is assigned, and reassigned if needed, to accommodate both the GROUP [the Wards] and the other parties who are using the HOTEL facilities during the GROUP's

6

event dates." It further provided that "[i]f the HOTEL resells the Function Space committed to the GROUP, revenue received by the HOTEL from the resale will reduce the amount owed by the GROUP." The contract continued that "[i]f Hotel . . . is unable to provide the requested space, the Hotel will work with Group to arrange alternative space." The contract, in other words, provided for a function space that was "assigned," "committed," and "reserved" for the Wards. The only questions for the jury were whether the Richelieu ballroom was the assigned, committed, and requested function space, and whether the lobby was a "comparable" alternative space when the hotel was unable to provide the Richelieu ballroom.

The jury answered in favor of the Wards, and the evidence at trial supported the jury's verdict. The hotel's computer system had the Richelieu ballroom as the reserved function space for the reception. A banquet event order form generated by the hotel identified the Richelieu ballroom as the space rented for the wedding. And the electronic mail and text messages sent between Ward and Deauville's catering manager confirmed the assigned function space was the Richelieu ballroom.

The alternative space that the hotel provided, moreover, was not "comparable." The jury saw a schematic drawing and pictures of the hotel comparing the Richelieu ballroom and the lobby. Witnesses testified that the

7

tables were "crammed" into the lobby; there was no ocean view; there was no room for a head table with bridesmaids and groomsmen; the music was drowned out; and there was no separation between wedding and hotel guests. This evidence, viewed in the light most favorable to the Wards, supported the jury's verdict that the hotel did not provide the reserved and committed space, and when it was unable to do so, the hotel did not provide a "comparable" alternative as required by the contract.

## 2. Compensatory Damages.

Deauville, next, contends that the jury awarded more compensatory damages than was supported by the evidence. The Wards, the hotel argues, paid $12,985.65 for food and beverages, which money also included use of the room. The jury's award of $25,500 ($23,000 to Ward and $2,500 to her husband as a third-party beneficiary), Deauville continues, was far too high. The $25,500 was justified, the Wards respond, for two reasons: the incidental expenses for flowers, linens, photography, videography, entertainment, transportation, and cake cost the couple $9,500; and the rental value of the Richelieu ballroom was $15,000.

As to the incidental expenses claimed by the Wards, the evidence at trial was that they had flowers, linens, photography, videography, entertainment, transportation, and cake at the wedding. While these things were not in the Richelieu ballroom, they were at the wedding and used by the Wards and their

guests. "Compensatory damages are designed to make the injured party whole to the extent that it is possible to measure such injury in monetary terms." MCI Worldcom Network Servs., Inc. v. Mastec, Inc., 995 So. 2d 221, 223 (Fla. 2008). A plaintiff "is not entitled to recover compensatory damages in excess of the amount which represents the loss actually inflicted by the action of the defendant." Id. The purpose of compensatory damages is not to punish defendants or to "bestow a windfall on plaintiffs." Id. at 224 (quotation omitted). The Wards were already whole with regard to these incidental expenses. They cannot get the benefit of these expenses twice. See Kingswharf, Ltd. v. Kranz, 545 So. 2d 276, 278 (Fla. 3d DCA 1989) ("Both counts were based on the same elements of damages, and there is clearly a duplication in the damages awarded. Double recovery on the same element of damages is prohibited.").

As to the Wards' position that the damage award compensated them for the value of the ballroom, the evidence at trial showed that the cost of the Richelieu ballroom was free when a party, like them, entered into a food and beverage contract with the hotel. Only where a party rented the room by itself – without a food and beverage contract – would they pay $15,000 for the rental. Here, the Wards entered into a food and beverage contract and, therefore, did not pay for renting the ballroom. Awarding them the value of renting the Richelieu ballroom when the couple was not charged and did not pay for renting it by virtue of the

9

food and beverage contract would constitute a "windfall," paying the Wards twice for the same thing. MCI, 995 So. 2d at 224.

There was evidence at trial supporting the jury's compensatory damages verdict for the $12,985.65 paid for the food and beverage contract to secure the requested function space. Beyond that, the directed verdict motion should have been granted.

### 3. Intentional Infliction of Emotional Distress

Deauville, finally, contends that its conduct was legally insufficient to support a claim for outrageous conduct required for an intentional infliction of emotional distress claim. To prove intentional infliction of emotional distress, the plaintiff must show:

> (1) The wrongdoer's conduct was intentional or reckless, that is, he intended his behavior when he knew or should have known that emotional distress would likely result;
> (2) the conduct was outrageous, that is, as to go beyond all bounds of decency, and to be regarded as odious and utterly intolerable in a civilized community;
> (3) the conduct caused emotion distress; and
> (4) the emotional distress was severe.

LeGrande v. Emmanuel, 889 So. 2d 991, 994 (Fla. 3d DCA 2004). What constitutes outrageous conduct is a question that must be decided as a matter of law. De La Campa v. Grifols Am., Inc., 819 So. 2d 940, 943 (Fla. 3d DCA 2002) ("What constitutes outrageous conduct is a question for the trial court to determine as a matter of law.") The plaintiff's "subjective response" to the conduct "does not

control the question of whether the tort of intentional infliction of emotional distress occurred." Liberty Mut. Ins. Co. v. Steadman, 968 So. 2d 592, 595 (Fla. 2d DCA 2007).

As to the second element, for one's actions to rise to the level of intentional infliction of emotional distress, it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Clemente v. Horne, 707 So. 2d 865, 867 (Fla. 3d DCA 1998) (quotation omitted). It is not "enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Gallogly v. Rodriguez, 970 So. 2d 470, 471-72 (Fla. 2d DCA 2007) (quotation omitted). In other words, even purposeful conduct that one knows is going to hurt another is not outrageous enough to support a claim.

For example, calling a minister a thief in front of his parishioners is not legally outrageous. See LeGrande, 889 So. 2d at 994; see also Food Lion, Inc. v. Clifford, 629 So.2d 201, 202-03 (Fla. 5th DCA 1993) (stating that a false accusation of theft was insufficient to support a cause of action for intentional infliction of emotional distress). Neither is a supervisor calling an African-

11

American employee the n-word and monkey, and threatening to fire the employee without cause. See Williams v. Worldwide Flight SVCS., Inc., 877 So. 2d 869, 870 (Fla. 3d DCA 2004).

Deauville, here, pulled a bait-and-switch. The Wards expected and paid for birds and bells at their wedding reception, and instead got bikini-clad hotel guests and background noise. We do not minimize or condone what Deauville did. It was wrong, and tortious (as reflected by the jury's negligent misrepresentation verdict), and caused the Wards physical and emotional distress. It was not worse, however, than purposefully and falsely ruining a pastor's reputation in his church and community, or ruining one's career by hurling racial slurs and making him think he's going to be fired for no reason. The Wards' day was ruined; the LeGrande and Williams plaintiffs had ruined reputations and careers. Because the courts did not find what the LeGrande and Williams defendants did to be sufficiently outrageous, we cannot find the Deauville's conduct to be legally outrageous either.

The two cases cited by the Wards in support of their intentional infliction claim, Steadman and Thomas v. Hosp. Bd. of Dirs. of Lee Cnty., 41 So. 3d 246 (Fla. 2d DCA 2010), are telling. In Steadman, the insurance company intentionally denied and delayed payment for the plaintiff's treatment in an effort to speed up her demise, to induce stress that it knew would be detrimental to her health, and to

12

inflict emotional distress.  Steadman, 968 So. 2d at 595.  In Thomas, "[a] hospital and its employees negligently rendered medical care, resulting in the death of the decedent" and, "[s]ubsequent to the death, the hospital and its employees then engaged in a purported cover-up and notified the family that the decedent died from natural causes despite knowing that such information was false." Thomas, 41 So. 3d at 254.  The Steadman and Thomas cases, in essence, dealt with matters of life-and-death.  The defendants in those cases caused the death of another, and intentionally inflicted harm.

A wedding day is an important one in the lives of a young couple.  Wedding memories – good or bad – do not easily fade.  Causing these bad memories (as the hotel did here), however, is many degrees removed from causing or covering up the negligent death of another on the outrageousness scale.  Purposefully causing death by withhold insurance benefits or covering up the negligent death of a family member is atrocious, utterly intolerable, and outside the bounds of decency in a way that causing nightmares, disappointment, and embarrassment because of a ruined wedding is not.

*Conclusion*

For these reasons, we affirm the trial court's decision denying Deauville's post-trial directed verdict motion as to jury's finding the hotel breached the food and beverage contract.  We reverse the trial court's decision denying the directed

verdict motion as to: (1) the jury's award of breach of contract damages for any amount greater than $12,985.65; and (2) the jury's finding that the hotel engaged in extreme and outrageous conduct. We remand for the trial court to enter judgment on Kemesia Ward's breach of contract claim for $12,985.65; on Patrick Ward's third-party beneficiary claim for $1.00 as nominal damages[3]; and for Deauville on the intentional infliction of emotional distress claim.

Affirmed in part, reversed in part, and remanded with instructions.

---

[3] Destiny Const. Co. v. Martin K. Eby Const., 662 So. 2d 388, 390 (Fla. 5th DCA 1995) ("[E]ven if Destiny is not able to prove that it sustained actual damages as a result of the breach, Destiny would be entitled to recover nominal damages upon a showing of breach of contract."); Young v. Johnston, 475 So. 2d 1309, 1313 (Fla. 1st DCA 1985) ("An aggrieved party who has suffered no damages is entitled to a judgment for nominal damages only." (citation omitted)); AMC/Jeep of Vero Beach, Inc. v. Funston, 403 So. 2d 602, 605 (Fla. 4th DCA 1981) ("While there is a legal remedy for every legal wrong and, thus, a cause of action exists for every breach of contract, an aggrieved party who has suffered no damage is only entitled to a judgment for nominal damages."), quoted in In re Standard Jury Instructions – Contract & Bus. Cases, 116 So. 3d 284, 341 (Fla. 2013).