# Third District Court of Appeal

## State of Florida

Opinion filed March 4, 2026.
Not final until disposition of timely filed motion for rehearing.

_____

Nos. 3D23-2235 & 3D24-0775
Lower Tribunal No. 22-20044

_____

**Jose Fabian Lopez, etc.,**
Appellant,

vs.

**Kendall Healthcare Group, Ltd., et al.,**
Appellees.

Appeals from the Circuit Court for Miami-Dade County, Pedro P. Echarte, Jr., Judge.

Eaton & Wolk, PL, and Daniel R. Schwartz and Douglas F. Eaton, for appellant.

Tache, Bronis and Descalzo, P.A., and Walter J. Tache; Carlos Santisteban, Jr., P.A., and Carlos Santisteban, Jr., for appellees.

Before EMAS, LINDSEY and GOODEN, JJ.

EMAS, J.

## INTRODUCTION

In these consolidated appeals, the plaintiff below, Jose Fabian Lopez, appeals a final summary judgment entered in favor of defendant Kendall Healthcare Group, Ltd. d/b/a HCA Florida Kendall Hospital (3D23-2235) and a final summary judgment entered in favor of defendant Alex Marcovich (3D24-775). For the reasons that follow, we affirm both judgments.

## FACTUAL AND PROCEDURAL BACKGROUND

On May 28, 2022, Jose Lopez Canizares was riding his motorcycle when he was involved in an accident and transported to Florida Kendall Hospital (the Hospital). When Canizares arrived, he was cared for by emergency medical technicians ("EMT") Alex Marcovich and Cole Bouza. During treatment, EMT Marcovich took a photo of Canizares' leg injury without consent, shared it with other hospital employees, and posted the photo to his Instagram account, tagging EMT Bouza, who was visible in the photo. Bouza reposted the photo to his own social media account.

Three days later, on June 1, 2022, a privacy violation was reported to the Hospital and the Hospital initiated an investigation. Canizares' identity was established on June 8, 2022, but it was not until June 21 that Canizares' family was notified that a photo of him had been taken by hospital staff and posted on social media. This information was reported to Canizares'

father/medical proxy, Jose Fabian Lopez, by the Hospital's Privacy Officer, Mayra Mutaner. Mutaner told Lopez that the post had been deleted and that the EMTs had been retrained and disciplined. At the time this information was provided to Lopez (June 21), Canizares was on life support and Lopez was making the decision whether to discontinue his son's life support. Two days later, Canizares passed away.

Lopez, as the personal representative of his son's estate, filed suit against the Hospital and the two EMTs (Marcovich and Bouza) individually. The operative complaint alleged claims for intentional infliction of emotional distress and invasion of privacy against Marcovich, negligence against Bouza, and, against the Hospital, negligence,[1] intentional infliction of emotional distress and vicarious liability for the actions of its EMTs.

The Hospital moved for final summary judgment, asserting: it properly disclosed the privacy violation to Lopez; its communication of same was not outrageous as a matter of law; that Lopez's claims for vicarious liability fail as a matter of law because he cannot establish that the EMTs' actions furthered the interests of, or were motivated by the interests of, the Hospital;

---

[1] This negligence count against the Hospital was later dismissed with prejudice and is not at issue in this appeal.

3

and that there was no invasion of privacy because the images of Canizares do not identify him.

Marcovich and Bouza also moved for summary judgment on the claims against them, asserting that Marcovich's conduct was not outrageous as a matter of law, was without intent to cause distress, and that no private facts were disclosed.

Lopez filed a response to both summary judgment motions. The trial court held a hearing on the Hospital's motion and thereafter granted it "for the reasons . . . raised in [the Hospital's] motion." The trial court concluded, as a matter of law, that the privacy officer's disclosure of the incident to Lopez was not outrageous. The court also found as a matter of law that there was no invasion of privacy.[2]

The court later held a hearing on the summary judgment motion of Marcovich and Bouza, finding that Marcovich's actions in taking the photo and posting it on social media was not outrageous, and granted summary judgment in favor of Marcovich, but denied the summary judgment motion as to the negligence claims against Bouza.  In separate orders, final

---

[2] This was based on the fact that neither Canizares nor Lopez was identifiable in the photo or posting, and there was no evidence that Lopez or any relatives ever saw the posting before it was removed.

judgment was entered in favor of the Hospital and Marcovich, and these consolidated appeals followed.[3] We review de novo the trial court's ruling on the motions for summary judgment. See Brownlee v. 22nd Ave. Apts., LLC, 389 So. 3d 695, 698 (Fla. 3d DCA 2024).

**ANALYSIS AND DISCUSSION**

Lopez contends that the trial court erred in granting final summary judgment on the intentional infliction of emotional distress claims because whether the conduct was outrageous presents a question of fact for the jury. Lopez further contends the trial court erred in granting final summary judgment on the invasion of privacy claims because Canizares was clearly identifiable to his friends and acquaintances in the photo. Finally, Lopez argues that the trial court erred in granting summary judgment on the vicarious liability claims because Marcovich and Bouza were on duty and their actions were intended to promote the Hospital's trauma team.

---

[3] Although claims against Bouza remain in the lower tribunal, we have jurisdiction to review the final judgments in favor of the Hospital and Marcovich, as the judgments complete all judicial labor involving these two parties. See Fla. R. App. P. 9.110(k) (authorizing appeal from a partial final judgment that "totally disposes of an entire case as to any party" and "must be appealed within 30 days of rendition." See also Lifshultz v. 20 Condo. Ass'n, Inc., 300 So. 3d 1224 (Fla. 3d DCA 2020).

## The Intentional Infliction of Emotional Distress Claims

Florida recognizes the tort of intentional infliction of emotional distress and has adopted the Restatement of Torts' definition. Metropolitan Life Ins. Co. v. McCarson, 467 So. 2d 277 (Fla. 1985). That is, there is only liability "where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id. at 278-79 (quoting Restatement (Second) of Torts § 46 (1965)). An Intentional Infliction of Emotional Distress claim "requires the following elements: (1) intentional or reckless conduct; (2) outrageousness beyond all bounds of decency; (3) causation; and (4) severe distress. The second prong is the gravamen of the tort." Steinmetz v. Pickholtz, 414 So. 3d 309, 316 (Fla. 3d DCA 2025) (citations omitted). See also Deauville Hotel Mgmt., LLC v. Ward, 219 So. 3d 949, 955 (Fla. 3d DCA 2017) ("What constitutes outrageous conduct is a question that must be decided as a matter of law.").

It is important to distinguish between the three Intentional Infliction of Emotional Distress claims alleged in this case: (1) direct claim against the Hospital for the privacy officer's disclosure of the incident to Lopez; (2) direct claim against Marcovich for his actions in taking the photo and posting it on

6

social media; and (3) vicarious claim against the Hospital for Marcovich's actions.

The court found as a matter of law that the actions of Marcovich and the actions of the Hospital (via the privacy officer) were not outrageous, and thus, both defendants were entitled to summary judgment. See Deauville Hotel Mgmt., 219 So. 3d at 955. See also Cruz v. North Shore Med. Ctr., Inc., 320 So. 3d 964, 964 (Fla. 3d DCA 2021) ("What constitutes outrageous conduct is a question of law for the trial court to determine as a matter of law." (quoting De La Campa v. Grifols Am., Inc., 819 So. 2d 940, 943 (Fla. 3d DCA 2002) (superseded on other grounds by statute, as recognized in White v. AutoZone Inv. Corp., 345 So. 3d 284 (Fla. 3d DCA 2022)))).

As for the Hospital's action in informing Lopez about the photo/social media post, we agree that the privacy officer's actions were not outrageous as a matter of law and thus, that there was no direct intentional infliction of emotional distress by the Hospital. See e.g., McCarson, 467 So. 2d at 279-80 (holding Intentional Infliction of Emotional Distress claim not supported where insurance company demanded proof of ineligibility for Medicare and withheld further benefits because the insurance company "did no more than

7

assert legal rights in a legally permissible way"); [4] Ward, 219 So. 3d at 955 (hotel promising to hold wedding reception in hotel ballroom and then, on day of wedding, foisting couple into the lobby not sufficiently outrageous); Williams v. Worldwide Flight SVCS, Inc., 877 So. 2d 869 (Fla. 3d DCA 2004) (supervisor calling African-American employee the N-word and monkey, and threatening to fire employee without cause, not outrageous enough to support Intentional Infliction of Emotional Distress claim); Paul v. Humana Med. Plan, Inc., 682 So. 2d 1119 (Fla. 4th DCA 1996) (doctor's alleged medical negligence did not rise to the level of outrageousness required for Intentional Infliction of Emotional Distress claim). Cf. Ford Motor Credit Co. v. Sheehan, 373 So. 2d 956 (Fla. 1st DCA 1979).

As for EMT Marcovich's conduct in taking and posting the photo, it is significant to note that the claim for Intentional Infliction of Emotional Distress is not made on behalf of Canizares (i.e., the person whose photo was taken and posted). It is instead Canizares's father, Lopez, who asserts his own claim for Intentional Infliction of Emotional Distress based on Marcovich (and the Hospital vicariously) taking and posting the photo.

---

[4] The Hospital's privacy officer, Ms. Mutaner, relayed to Lopez what had taken place with his son, as she believed she was required to do under the Health Insurance Portability and Accountability Act ("HIPAA") which requires hospitals to notify a patient's next of kin when a breach of unsecured protected health information occurs. See 45 C.F.R. § 164.404(a).

8

In the case of <u>M.M. v. M.P.S.</u>, 556 So. 2d 1140 (Fla. 3d DCA 1989), the parents of an adult woman were told by M.P.S. that he had sexually abused their daughter, and that his wife had supplied her with illegal drugs, from the time she was eight years old until she was twenty-three. The parents filed suit, alleging M.P.S. had intentionally inflicted emotional distress on them by telling them this. The trial court dismissed their complaint for failure to state a cause of action.

On appeal, this court affirmed, "[c]oncluding that Florida law provides no cause of action under these circumstances." <u>M.P.S.</u>, 556 So. 2d at 1140. Specifically, this court held that M.P.S. "merely provided information without intending to cause separate harm" to the parents. <u>Id.</u> at 1141. The parents were not present when the alleged abuse of their daughter took place. The harm inflicted was inflicted by M.P.S. upon the daughter (who filed her own claim against him) not upon the parents. As we observed in <u>M.P.S.</u>:

> If courts were to allow relatives of tort victims compensation for the distress they suffer when they receive bad news about family members when there is no attendant intentional or reckless conduct directed toward them, an avalanche of litigation would ensue. Compensation is available for actual harm to the victim; only in carefully prescribed circumstances is compensation permitted for relatives who suffer emotional distress. It is not lack of compassion, but necessity, that restricts relief to the immediate victim. For these reasons, we affirm the order dismissing the complaint with prejudice.

Id. at 1141. See also Buchanan v. Miami-Dade Cnty., 400 So. 3d 684, 686 (Fla. 3d DCA 2024) (relying on M.P.S., holding that because plaintiff wasn't present when police officer shot his dog, his Intentional Infliction of Emotional Distress claim for that action was not viable: "a plaintiff must be present when the alleged extreme and outrageous conduct is directed toward a third party.").

So too, in this case, Lopez was not present when EMT Marcovich took the photo or when he posted it on social media, and it is undisputed that he never saw them either (the post was taken down within hours and long before Lopez was notified about the incident). Nevertheless, Lopez cites to a Fifth District decision, Williams v. City of Minneola, 575 So. 2d 683 (Fla. 5th DCA 1991), where our sister court recognized an exception to the presence requirement for conduct involving the display of "dead bodies."

In Minneola, a young boy (14) died of an apparent drug overdose, and one of the investigating police officers took a video of the boy's autopsy and later viewed the video at home in the presence of other police officers and a friend unrelated to the investigation. The deceased boy's mother filed suit alleging, inter alia, reckless infliction of emotional distress. The trial court granted summary judgment in favor of the police officer and his employer (the City of Minneola), and the appellate court reversed, finding that whether

10

the tort was committed was a question for the jury. The court held "a cause of action in tort for reckless infliction of emotional distress can lie for outrageous conduct involving pictures of the dead body of a plaintiff's . . . child. . . even though the plaintiff was not present at the display of the pictures and the allegedly tortious conduct did not physically impact the plaintiff, whether or not the emotional distress in turn caused physical harm to the plaintiff." City of Minneola, 575 So. 2d at 690.

In the present case, it is undisputed that Canizares was alive at the time EMT Marcovich took the photo of his leg and posted it on social media. Lopez argues, however, that the exception recognized in Minneola still applies because Canizares was unconscious at the time and later died without regaining consciousness. We do not agree that the exception recognized in Minneola should be extended to apply to the circumstances presented in the instant case.

Minneola pronounced that "our society . . . shows a particular solicitude for the emotional vulnerability of survivors regarding improper behavior toward the dead body of a loved one, and the special deference paid by courts to family feelings where rights involving dead bodies are concerned is central to our decision." City of Minneola, 575 So. 2d at 691. The court continued:

11

One obvious reason is that the bereaved are already suffering psychic trauma because of the loss of a loved one and are especially sensitized to any disrespect or indignity directed at the deceased's body or a representation of it. The potential for severe emotional distress is enormously increased in that situation. All of this is well known to the ordinary person, and so a level of carelessness or callousness which might not be considered tortious in other situations can show outrageousness and recklessness when a dead body or a picture of a dead body is involved.

Id.

Importantly, the Minneola court focused on the foreseeability that the behavior with regard to pictures of dead bodies would cause severe emotional distress to the deceased's survivors should they become aware of the tortfeasor's behavior. Id. at 692-93. The court held that it was a jury question whether it was reasonably foreseeable that the boy's mother would learn of the events involving the pictures of their dead family member and thus, that summary judgment was not proper. However, the Minneola court specifically said: "The limits on standing to sue in such a case are necessarily arbitrary, but a line must be drawn somewhere, and we hold that persons have standing to sue for this tort if they occupied the role of spouse, child, sibling or parent to the deceased." City of Minneola, 575 So. 2d at 691.

The instant case involves a person who sustained grave injuries, who was in the hospital, and who did eventually pass away from those injuries. However, the photo taken and posted was of a person who was alive, not

12

dead. Though some might view this as a mechanical application of Minneola, it is not an arbitrary one. It is instead a practical recognition that there must be a limiting principle to the exception established in Minneola. As even Lopez acknowledges in his brief, there are no cases which extend the Minneola holding to a photo taken of a living person, and we decline the invitation to extend a claim of Intentional Infliction of Emotional Distress to encompass such a circumstance. We therefore affirm the trial court's summary judgment in favor of Marcovich and the Hospital on all claims for Intentional Infliction of Emotional Distress.

### The Invasion of Privacy Claims

The elements for the tort of invasion of privacy by public disclosure of private facts are: "1) the publication, 2) of private facts, 3) that are offensive, and 4) are not of public concern." Cape Publications, Inc. v. Hitchner, 549 So. 2d 1374, 1377 (Fla. 1989). Significant to our consideration of this case, such privacy rights are "personal in nature" and "can be maintained only by a living individual whose privacy is invaded." Loft v. Fuller, 408 So. 2d 619, 622 (Fla. 4th DCA 1981) (citing Restatement of Torts 2d, § 652). It is noteworthy that Lopez did not bring his claims in the name of his deceased son or his estate. He brought them as an invasion of his own privacy. Thus, Lopez was required to establish that the taking of a photo of his son and the

13

posting of it on social media somehow invaded his (Lopez's) privacy. As the Loft court pointed out, some cases "support the view that under certain circumstances the deceased's relatives may recover for the invasion of their own privacy interests even though they were not personally the focus of the publicity in question . . . . The rationale behind these decisions is that the relatives of the deceased have their own privacy interest in protecting their rights in the character and memory of the deceased as well as the right to recover for their own humiliation and wounded feelings caused by the publication." Loft, 408 So. 2d at 624. However, the court noted, such a case would be "unusual" and would present a "heavy burden" for the relatives to meet, requiring the conduct to "be sufficiently egregious to give rise to an independent cause of action in favor of members of decedent's immediate family." Id.

As in Loft, we find the allegations fail to provide a basis for an invasion of Lopez's privacy. First, and as the trial court indicated at the hearing, there is nothing in the photo or social media post which would identify Canizares—neither his name nor his face is shown or revealed by the photo. Even the name of the hospital where the photo was taken is not identified or revealed. We agree with the trial court that Lopez has failed to meet his "heavy burden" of showing his privacy rights were violated by Marcovich's action in taking

14

and posting a photo of his unidentified son while in the hospital, before he died.

Finally, as the argument that the court erred in granting summary judgment in favor of the Hospital on the claim of vicarious liability for EMT Bouza's negligence, we agree with the Hospital that, in reposting Marcovich's photo on his social media, Bouza was not acting in the course and scope of his employment with the Hospital, and thus, the Hospital cannot be held liable for those actions given the undisputed facts of this case. See City of Miami v. Simpson, 172 So. 2d 435, 437 (Fla. 1965) (reiterating that "[t]he liability of a master can arise in such instances only when the act of the servant is done within the real or apparent scope of the master's business"); Wood v. Royal Plus, Inc., 388 So. 3d 1121, 1124 n.1 (Fla. 3d DCA 2024) (reiterating three-pronged test set forth in Sussman v. Florida E. Coast Props., Inc., 557 So. 2d 74 (Fla. 3d DCA 1990) for determining whether an employee is acting within the scope of employment for purposes of vicarious liability, including that "the conduct is activated at least in part by a purpose to serve the master.").

**CONCLUSION**

For the reasons discussed, we hold the trial court properly entered final summary judgment in favor of Kendall Healthcare Group, Ltd. (3D23-2235)

15

and properly entered final summary judgment in favor of Alex Marcovich (3D24-775).

Affirmed.

LINDSEY, J., concurs.

GOODEN, J. (concurring in part, concurring in result in part)

I concur with the majority's opinion—except for the discussion on intentional infliction of emotional distress. I concur only in result in that portion. This is because I fundamentally disagree with the Fifth District's expansion of the cause of action of intentional infliction of emotional distress in Williams v. City of Minneola, 575 So. 2d 683 (Fla. 5th DCA 1991), where it created an exception to the presence requirement for "dead bodies or pictures of dead bodies." Neither our Court nor the Florida Supreme Court has ever applied this exception.[5] And, I do not believe that Florida law supports such an exception.

The Fifth District's invention is especially problematic where, as here, the cause of action is one born from the legal academy—not from the English common law adopted in our state through section 2.01, Florida Statutes, nor from later enactment by our Legislature. See Daniel Givelber, The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional

---

[5] While our Court has discussed the exception, it has insisted on the presence requirement—as the majority has done. See, e.g., Buchanan v. Miami-Dade Cnty., 400 So. 3d 684 (Fla. 3d DCA 2024).

17

Infliction of Emotional Distress by Outrageous Conduct, 82 Colum. L. Rev. 42, 42 (1982) ("Academics, rather than courts, were the prime movers in the development of the tort of intentional infliction of severe emotional distress by outrageous conduct; the modern tort was introduced in the pages of law reviews, and then refined and finally defined by the American Law Institute in its *Restatements*."); id. at 43 ("The 1934 *Restatement of the Law of Torts* took the position that there was no recovery for emotional injury, even when intentionally inflicted, if the defendant's conduct did not otherwise amount to a tort.  This position was vigorously and persuasively attacked by Magruder, Prosser, and others, and by 1948 the *Restatement* had reversed its position and 'restated' the law to be that one could recover for severe emotional injuries intentionally inflicted."); see also Calvert Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv. L. Rev. 1033 (1936); William L. Prosser, Intentional Infliction of Mental Suffering: A New Tort, 37 Mich. L. Rev. 874 (1939); Restatement of the Law, Supplement, Torts § 46 (1948); Restatement (Second) of Torts § 46 (1965).  Cf. Kansas v. Nebraska, 574 U.S. 445, 475 (2015) (Scalia, J., concurring in part and dissenting in part) ("The object of the original Restatements was 'to present an orderly statement of the general common law.' Over time, the Restatements' authors have abandoned the mission of describing the law, and have chosen instead

to set forth their aspirations for what the law ought to be.") (citation modified)).

As judges, we must resist the temptation to expand the law and create new rights. The common law should be an anchor, preventing the law from becoming untethered from ordered liberty and tradition. See § 2.01, Fla. Stat. Indeed, judges are "the depositar[ies] of the laws; the living oracles, who must decide in all cases of doubt, and who are bound by an oath to decide according to the law of the land." 1 William Blackstone, Commentaries on the Laws of England 69 (1765). Our task is "to keep the scale of justice even and steady, and not liable to waver with every new judge's opinion." Id. That is because judges do not do so "according to his own private judgment, but according to the known laws and customs of the land; not delegated to pronounce a new law, but to maintain and expound the old one." Id. See also Matthew Hale, The History of the Common Law of England 67–68 (1739).

As Alexander Hamilton explained in Federalist No. 78, "The courts must declare the sense of the law; and if they should be disposed to exercise will instead of judgment, the consequence would equally be the substitution of their pleasure to that of the legislative body." "The Framers quite naturally thought of judges as common law judges--as expositors and not inventors of

19

legal principles."  Hon. Diarmuid F. O'Scannlain, <u>Rediscovering the Common Law</u>, 79 Notre Dame L. Rev. 755, 760 (2004).  <u>See also</u> <u>Gamble v. United States</u>, 587 U.S. 678, 716 (2019) (Thomas, J., concurring) ("[E]ven common-law judges did not act as legislators, inserting their own preferences into the law as it developed.  Instead, consistent with the nature of the judicial power, common-law judges were tasked with identifying and applying objective principles of law—discerned from natural reason, custom, and other external sources—to particular cases.").

Above all, it is our job to say what the law is—not to create or change the law.  <u>See</u> <u>Marbury v. Madison</u>, 5 U.S. 137, 177 (1803).  The Fifth District's opinion in <u>Williams</u> is proof of the latter.